# In the United States Court of Federal Claims

No. 18-1146C

(Filed Under Seal: December 21, 2018)

(Reissued: January 2, 2019)

| | |
|---|---|
| **THOMA-SEA MARINE CONSTRUCTORS, LLC,** ) ) ) | Post-award bid protest; shipbuilding contract; standing; supplementation of |
| **Plaintiff,** ) ) | the administrative record; technical criteria for ship design and seakeeping; |
| **v.** ) ) | past performance evaluations; responsibility determination |
| ) | |
| **UNITED STATES,** ) ) | |
| **Defendant,** ) ) | |
| **and** ) ) | |
| **GULF ISLAND SHIPYARDS, LLC,** ) ) | |
| **Defendant-Intervenor.** ) ) ) | |

Nicholas T. Solosky, Fox Rothschild LLP, Washington, D.C., for plaintiff.  Of counsel was Doug Hibshman, Fox Rothschild LLP, Washington, D.C.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel were Katherine A. Andrias and Alex F. Marin, Associate Counsel, Naval Sea Systems Command, Washington, D.C.

Jacqueline K. Unger, PilieroMazza PLLC, Washington, D.C., for defendant-intervenor.  Of counsel was Jonathan T. Williams, Michelle E. Litteken, and Timothy F. Valley, PilieroMazza PLLC, Washington, D.C.

## OPINION AND ORDER[1]

---

[1]Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review this decision and provide proposed redactions of any

LETTOW, Senior Judge.

Plaintiff Thoma-Sea Marine Constructors, LLC ("Thoma-Sea") has protested the award by the Naval Sea Systems Command ("NAVSEA") of a shipbuilding contract valued at approximately $500 million to Gulf Island Shipyards, LLC ("Gulf Island"). At least one, and up to eight towing, salvage, and rescue ships are to be constructed. Thoma-Sea was one of four final bidders and was the likely second-place bidder. Thoma-Sea requests this court declare NAVSEA's award to Gulf Island as unreasonable, arbitrary, capricious, an abuse of discretion, and inconsistent with the contract solicitation's evaluation scheme. Am. Compl. at 22, ECF No. 33. Thoma-Sea seeks a permanent injunction against performance of the contract by Gulf Island and a direction to NAVSEA to award the contract to Thoma-Sea. Am. Compl. at 22.

After Thoma-Sea's protest complaint was filed, NAVSEA sought and was granted a 21-day voluntary remand. Order Granting Mot. to Remand (Aug. 10, 2018), ECF No. 27. Upon completion of the remand, NAVSEA confirmed its award to Gulf Island, and Thoma-Sea submitted an amended protest complaint. Thoma-Sea alleges (1) that the Navy committed procurement error by failing to verify the seakeeping claims in Gulf Island's proposal, Am. Compl. ¶¶ 47-58, (2) that Gulf Island intentionally withheld negative information from NAVSEA, indicating a lack of business integrity and making NAVSEA's decision to award the contract to Gulf Island arbitrary and capricious, Am. Compl. ¶¶ 59-73, (3) that NAVSEA's remand decision was arbitrary, capricious, and contrary to law because NAVSEA failed to properly consider or investigate the alleged technical and past-performance deficiencies of Gulf Island, Am. Compl. ¶¶ 78-88, and (4) that NAVSEA's re-assessment of past performance on remand, which downgraded equally both Thoma-Sea and Gulf Island, was arbitrary, capricious, and contrary to law because NAVSEA changed the evaluation criteria and engaged in discussions only with Gulf Island, Am. Compl. ¶¶ 89-94, and (5) that NAVSEA conducted an improper tradeoff analysis to arrive at best value, caused by NAVSEA's evaluation errors, Am. Compl. ¶¶ 74-77.

Thoma-Sea filed its amended motion for judgment on the administrative record on October 24, 2018. Pl.'s Am. Mot. for Judgment on the Admin. Record & to Suppl. the Admin. Record ("Pl.'s Am. Mot."), ECF No. 48.[2] The United States ("the government") filed a cross-motion for judgment on the administrative record and opposing Thoma-Sea's motion for judgment. Def.'s Mot. for Judgment upon the Admin. Record, Opp'n to Pl.'s Mot. to Suppl. the Admin. Record, & Opp'n to Pl.'s Mot. for Judgment upon the Admin. Record ("Def.'s Cross-Mot."), ECF No. 55. Gulf Island, having been permitted to intervene, filed a cross-motion for

---

confidential or proprietary information. The resulting redactions are shown by asterisks enclosed brackets, *e.g.*, "[***]."

[2]The government filed the administrative record on September 14, 2018. It is consecutively paginated, divided into 115 tabs and subtabs, and consists of nearly 20,000 pages. Citations to the record are cited by tab and page as "AR ___ - ___." The record was supplemented by consent three times, on October 12, ECF Nos. 38 & 39, October 24, ECF Nos. 46 & 47, and November 19, ECF Nos. 59 & 61. Other attempts to supplement the record with expert reports and a declaration are addressed later in this opinion.

judgment on the administrative record and in opposition to Thoma-Sea's motion for judgment on the administrative record.  Def.-Intervenor's Cross-Mot. for Judgment on the Admin. Record ("Def.-Intervenor's Cross-Mot."), ECF No. 54.

Thoma-Sea's motion to supplement the administrative record asks the court to receive and consider two expert reports by Dr. Brandon Taravella, an Associate Professor of Naval Architecture and Marine Engineering at the University of New Orleans, regarding the seakeeping criteria specified in the NAVSEA solicitation's request for proposals.  *See* Pl.'s Am. Mot. at 1, 13-14, 14 n.2 & Ex. A at Suppl. AR000001-11 ("First Taravella Report"); Pl.'s Reply Mem. in Further Support of Pl.'s Am. Mot. for Judgment on the Admin. Record & Mot. to Suppl. the Admin. Record ("Pl.'s Reply") at 4-6 & Attach. at Suppl. AR 000108-33 ("Second Taravella Report"), ECF No. 60.  Gulf Island opposes Thoma-Sea's motion to supplement the record, Def.-Intervenor's Opp'n to Pl.'s Mot. to Suppl. the Admin. Record ("Def.-Intervenor's Opp'n"), ECF No. 53, but, if the court does grant Thoma-Sea's motion to supplement, Gulf Island requests inclusion in the record of two expert reports by Dr. Kevin Maki, an Associate Professor of the Department of Naval Architecture and Marine Engineering, College of Engineering, University of Michigan.  Def.-Intervenor's Opp'n at 6-7 & Ex. A ("First Maki Report"); Def.-Intervenor's Reply Mem. in Support of its Cross-Mot. for Judgment on the Admin. Record ("Def.-Intervenor's Reply") at Ex. A ("Second Maki Report"), ECF No. 63.  The government also opposes Thoma-Sea's motion to supplement, *see* Def.'s Cross-Mot. at 27-31, but the government's cross-motion and opposition includes a declaration from [***], chair of the Source Selection Advisory Council ("Advisory Council") during the initial evaluation and the Source Selection Authority during remand, "solely to address the issue of prejudice" in the procurement, Def.'s Cross-Mot. at 39 & Attach. 1 ("[***] Decl.").

Each of the parties filed replies.  *See* Pl.'s Reply; Def.'s Reply in Support of its Mot. for Judgment upon the Admin. Record ("Def.'s Reply"), ECF No. 62; Def.-Intervenor's Reply.

The court held a hearing on these competing motions on November 27, 2018.

The court declines to supplement the administrative record with the proffered expert reports submitted by Thoma-Sea and Gulf Island.  It accepts the [***] Declaration submitted by the government solely as part of the materials before the court relating to prejudice, but because it finds that declaration to be a *post hoc* rationalization, it accords it little weight.  The court concludes that Thoma-Sea's contentions of error in the procurement lack merit.  Accordingly, Thoma-Sea's motion for judgment on the administrative record is denied and the government's and Gulf Island's cross-motions for judgment are granted.

## FACTS[3]

---

[3]The recitations that follow constitute findings of fact by the court from the administrative record of the procurement filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC").  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

A. *NAVSEA's T-ATS Procurement Plans & Solicitation*

The United States Navy maintains a fleet of towing, salvage, and rescue ships.  AR 4-27; AR 6-72.  The expected end of the service life of these ships arises in 2020 to 2025, and the Navy began the procurement process to replace those vessels in November 2007.  *E.g.*, AR 4-27; AR 6-72. Two classes of vessels currently provide these services (the T-ATF and T-ARS classes),[4] and the Navy decided replace them with one class, the T-ATS.  AR 2a-5; AR 6-72; AR 10a-352.  The T-ATS was to be "based on an existing commercial design," with minimal modifications to the parent design to achieve Navy missions.  AR 2a-5 to 6.

Between 2013 and 2017, NAVSEA progressed to the point where it had developed an "indicative design" for the potential acquisition of the proposed T-ATS based on an existing type of commercial vessel modified for specific features of the T-ATS.  *See generally* AR 90-19355 to 96-19756 (seven analyses for an indicative design).  The indicatively designed vessel measured 80 meters in length by 18 meters at maximum width, and at full load displaced just over 5,000 metric tons with a 5.5 meter draft.  AR 94-19665.  The indicative design assisted NAVSEA in preparing the solicitation by supporting the development of cost estimates and required capabilities, serving as a point of comparison with proposals.  AR 93-19402.

The Navy completed its acquisition plan on March 28, 2017 and its source selection plan on March 30, 2017.  AR 7-87.  The Navy decided to hold a competitive negotiated procurement set-aside for small businesses.  AR 6-81; AR 7-89; AR 19-1025, 1136 (incorporating Federal Acquisition Regulation ("FAR") Clause 52.219-6, Notice of Total Small Business Set-Aside).[5] The acquisition plan called for eight vessels, to be awarded to a single shipbuilder using fixed-price contracts.  AR 6-75, 81 to 82.  The Navy sought a vessel based on mature commercial vessel design.  AR 6-82.  The source selection plan describes the five evaluation factors as (1.0) ship design, (2.0) production, (3.0) management, (4.0) past performance, and (5.0) price.  AR 7-108 to 14.  The first three factors are collectively known as the "technical" factors and the first four factors as the "non-price" factors.  AR 7-108, 110.

---

[4]The ships in the T-ATF class are ocean-going fleet tugs, and the vessels in the T-ARS class are rescue/salvage ships.  AR 2a-5.

[5]A "small business concern" is "independently owned and operated, not dominant in the field of operation in which it is bidding on [g]overnment contracts, and qualified as a small business under the size standards in [the] solicitation."  FAR § 52.219-6.  For shipbuilding, a small business is one with fewer than 1,250 employees.  *See* AR 19-1173; *see also* 13 CFR § 121.201 (small business size standards code 336611 – "Ship Building and Repairing").

The government was originally unable to identify sufficient small business interest to allow for a set-aside.  AR 4-42.  By the time the solicitation was issued, however, the government had determined that a sufficient number of capable small businesses were interested in the contract.  AR 9-173; AR 12-928.

4

NAVSEA issued the solicitation on March 31, 2017, as a negotiated request for proposals. AR 10-175. Proposals were due by June 13, 2017. AR 19-1028.[6] NAVSEA amended the solicitation eight times between April and October 2018, none of which are material to the protest except for Amendment 0007.[7] The pertinent part of Amendment 0007 provided that failure to meet Factor 1.0 - Ship Design mandatory requirements would not automatically result in either an "unacceptable" technical rating or ineligibility from further consideration. AR 17-1004.[8]

The solicitation called for delivery of one T-ATS ship under a firm-fixed-price contract, with seven options each for one additional T-ATS ship, and several other options for supporting equipment and ancillary services. AR 19-1030 to 40. The option for the second ship and supporting equipment and ancillary services also used a firm-fixed-price contract while the options for ships 3-8 would each use a fixed-price basis with an economic adjustment. AR 19-1030 to 40. The solicitation specified the maximum award amount for each ship, which capped the maximum total shipbuilding cost at approximately $553.6 million. AR 19-1040, 1187. The

---

[6]The original due date was May 31, 2017. AR 10-175. Amendment 0004 extended the proposal due date to June 13, 2017. *See* AR 14-938.

[7]Amendment 0007 provided guidance for reporting the cost of handling materials, set a timeline for obtaining a certification report regarding drydocking and shipbuilding, and changed the evaluation criteria for Factor 1.0 (Ship Design). AR 17-992 to 1005. The other amendments were largely unrelated to ship design.

Amendment 0001 answered three questions regarding acquisition of certain items from foreign sources. AR 11-921 to 23. Amendment 0002 answered 14 questions immaterial to the protest grounds, provided minutes from a pre-award conference held April 18, 2017, and added a contract clause about use of foreign-manufactured anchor chains. AR 12-924 to 33. Amendment 0003 answered 11 questions immaterial to the protest grounds and altered solicitation Section L-3 regarding proposal preparation to specify page count limits for submission of the technical proposal. AR 13-934 to 37. Amendment 0004 extended the proposal due date to June 13, 2017, answered four questions unrelated to the protest grounds, incorporated several Federal Acquisition Regulation clauses unrelated to the protest grounds, and amended specifications for communication equipment and equipment furnished by the government. AR 14-938 to 83. Amendment 0005 answered five questions unrelated to the protest grounds and changed the delivery timeline for the second ship. AR 1-984 to 87. Amendment 0006 answered two questions about page count limits and further amended page count limits for the technical proposal. AR 16-988 to 91. Amendment 0008 updated requirements regarding bid, performance, and payment bonds and updated two labor and material pricing formulas. AR 18-1006 to 19.

[8]Where the proposal "deviates from or does not address mandatory requirements . . . or otherwise does not meet any mandatory [] requirements, then the failure to meet any such requirement *may* be evaluated as a deficiency which *may* result in a technical rating of 'Unacceptable' and the Offer *may* be ineligible for award." AR 17-004 (emphasis added, changing "will" to "may").

solicitation required delivery of the first ship within 30 months after award, delivery of the second ship within 28 months of exercising the option, and delivery of the remaining ships within 26 months of exercising the option for each additional ship.  AR 19-1091.

## B. *Evaluation Criteria Established by the Solicitation*

The source selection plan organized a three-tiered approach to proposal evaluation.  The Source Selection Authority ("Selection Authority"), among other responsibilities, would make the ultimate determination of which proposal represented best value, based on the proposals and recommendations from the Advisory Council and the Source Selection Evaluation Board ("Evaluation Board").  AR 7-95 to 97, 117.  The Evaluation Board was to conduct the first assessment of all proposals and provide its report to the Advisory Council.  AR 7-96, 102 to 105.  The six-person Advisory Council was responsible for evaluating the recommendations of the Evaluation Board and reporting its findings and recommendations to the Selection Authority.  AR 7-96, 99 to 101.

The source selection plan directs the Evaluation Board to "conduct a detailed evaluation of each Offeror's proposal in accordance with Sections L and M[, proposal preparation requirements and evaluation factors,] of the solicitation . . . considering the merits of each proposal in terms of the established solicitation requirements and in accordance with the evaluation criteria set forth in Section M."  AR 7-110.  For each technical factor, the Evaluation Board was to detail each proposal's strengths and weaknesses, to include "the degree to which an Offeror's proposed approach to achieving the technical factor may involve risk of disruption to schedule, degradation of performance, the need for increased [g]overnment oversight, and the likelihood of unsuccessful contract performance."  AR 7-110 to 11.  For the past performance factor, the evaluation board had to assess the relevancy of past performance to the current contract, how well the contractor performed that contract, and how well that performance would translate to successful performance of the T-ATS contract.  AR 7-112.  The Evaluation Board consisted of a chairperson, six advisors, and 16 members divided into technical, past performance, and price analysis teams.  AR 7-119 to 20.

The solicitation stated that the government "intend[ed] to award one contract for T-ATS Detail Design and Construction to the responsible Offeror whose proposal represents the best value . . . , price and other factors considered . . . using a tradeoff source selection approach" that would compare proposals based on "their ratings, and their strengths, weaknesses, risks, and price."  AR 19-1194.  The award would not necessarily go to the lowest price offer.  AR 19-1194.  The solicitation established five "adjectival ratings" for each of the three technical factors (factors 1.0-3.0), ranging from "Outstanding" to "Unacceptable."  AR 19-1194 to 95.  The past performance factor was evaluated upon both relevancy of past work and the government's confidence in the contractor performing successfully, and used four adjectival ratings for relevance, ranging from "Very Relevant" to "Not Relevant," and five adjectival ratings for confidence, ranging from "Substantial Confidence" to "No Confidence."  AR 19-1195 to 96.  Regarding price, any proposals that offered a price on a ship that exceeded the maximum award specified for that ship could be excluded from the competitive range, and no award would be made for any offer in excess of the maximum award.  AR 19-1196.

In determining best value, the solicitation provided that "the non-price factors, when combined, will be considered significantly more important than price." AR 19-1200. "Factor 1.0 is the most important[,] Factor 4.0 is the next most important and Factors 2.0 and 3.0 are of equal importance but less than Factor 4.0." AR 19-1200. Price would become increasingly relevant "[a]s competing proposals approach equality in the non-price factors." AR 19-1200.

The solicitation provided detailed guidance about considerations for each factor. AR 19-1196 to 1200. For Factor 1.0 – Ship Design, the solicitation created three categories of requirements: Mandatory, Non-Mandatory, and Desired. AR 19-1196. Specific requirements were contained in the Circular of Requirements, solicitation attachment J-1. *See generally* AR 10a-344; *see also* AR 19-1196. Failure to address, meet, or deviate from mandatory requirements may have made the proposal ineligible for an award. AR 19-1196.

NAVSEA required offerors to base the "Proposed T-ATS Baseline Design [] on a mature commercial vessel design . . . [that] has been previously constructed or is currently being constructed." AR 19-1179. Mandatory requirements included: maintaining a sustained speed of 11 knots; traveling for 8,000 nautical miles without re-fueling at full load at the most economical speed; delivering a minimum bollard pull of 130 short tons; possessing an aft deck that permitted operations over each side via an open, continuous, rectangular area of at least 465 square meters and measuring at least 40 meters by 11 meters; and berthing for 23 mixed-gender permanent crew. AR 10a-359 to 60; AR 89-19306. Additionally, for transit, towing, and rescue missions, the solicitation specified seakeeping requirements at given wave and wind conditions for roll, pitch, longitudinal and lateral acceleration, vertical acceleration, keel slams per hour, and deck wetness occurrences per hour. AR 10a-361 to 62 (seakeeping requirements table).

The seakeeping requirements are of particular relevance in this protest, especially the maximum pitching requirement. The seakeeping requirements were not denoted as mandatory or desirable, AR 89-19307 to 08, and the solicitation provided that for features not listed as mandatory or desirable, the government would "determine the extent to which the Offeror's proposed alternative feature . . . represents benefits . . . or technical risk, weaknesses, or deficiencies in the design." AR 19-1196 to 97. NAVSEA set seakeeping requirements using several parameters for four mission types: transiting at 11 knots in all headings relative to seas of 3.25 meters with 27-knot winds; towing at 3 knots in all headings relative to seas of 3.25 meters with 27-knot winds; rescue efforts holding station at the best possible heading in seas of 2.5 meters with 21-knot winds; and survival making best speed at the best possible heading in seas up to 9.0 meters with 55-knot winds. AR 10a-362. NAVSEA also provided three wave periods in which to assess seakeeping requirements for each of the four missions. AR 10a-362.

The solicitation's seakeeping requirements set a maximum pitch of 1.5 degrees for the towing, transit, and rescue missions. AR 10a-362.[9] NAVSEA's indicative design recommended

---

[9]The government asserts that pitch comprised 81 of 687 seakeeping requirements (not 81 of 885 as the government calculates), or nearly 12%. *Compare* AR 10a-361 to 62, *with* Def.'s Cross-Mot. at 8 n.3. For one set of parameters, consisting of ship speed, wave height, and wind speed, there were 3 wave periods, 13 headings relative to the seas ranging from 0 to 180 degrees at 15 degree intervals for two missions (transit and towing) and 1 heading for two missions (survival and rescue), and 1 to 9 seakeeping parameters based on the mission. AR 10a-361.

1.5 degrees to conform to a NATO standard for the relevant T-ATS missions.  AR 93-19426, 19502.  Deviations from any seakeeping requirement would not necessarily make the proposal ineligible for award.  *See* AR 17-1002, 1004; AR 19-1179, 1196; AR 28-7021 (assigning one bidder a weakness for not meeting pitch requirements in its initial proposal, but still finding the bidder within the competitive range).[10]

NAVSEA's pre-solicitation analysis of its indicative design found that the indicative design could not meet the 1.5 degree pitch requirement at most headings relative to the seas in Sea State 6 for either the transit mission traveling at 12 knots or the towing mission traveling at 3 knots.  AR 93-19508 to 10.[11]  The indicative design predicted that at 12 knots in upper Sea State 5, "a substantial increase in size is required to achieve the [1.5 degree pitch requirement]."  AR 93-19523.  NAVSEA noted, however, that the indicative design could meet pitch specifications "at most wave headings" using a mid Sea State 5, corresponding to wave heights of 3.25 meters.  *See* AR 93-19510, 19525.  Relatedly, NAVSEA also believed that meeting the pitch

---

Transit had 8 parameters, towing 9, rescue 8, and survival 1.  AR 10a-361 to 62.  Pitch comprised 81 of these requirements (3 wave periods and 27 different headings among the towing, transit, and rescue mission).  AR 10a-361 to 62.

Regarding its seakeeping claims, Thoma-Sea presents 156 pitch conditions, of which it could not meet 32.  AR 52-13981; *see also* AR 50b-13380.  The 156 pitch conditions arise from Thoma-Sea using 13 headings and 3 wave periods for 2 missions (transit and towing), each under 2 loading conditions.  AR 50b-13380.  The government's attempt to assess the pitch requirement in terms of a percentage of total seakeeping requirements has no evident support in the solicitation.  It is not evident that a vessel, regardless of its strengths, would be competitive if it failed to meet the pitch requirements for every mission even if it met a high percentage of seakeeping requirements.  At some point, the risk of excessive pitching would inhibit effective operations.  *See*, *e.g.*, AR 96-19749 to 52.

[10]The government also notes that NAVSEA responded to pre-solicitation questions regarding pitch that arose from a draft solicitation NAVSEA issued in November 2016.  Def.'s Cross-Mot. at 5.  One question noted that "vessel[]s in the T-ATS size range will have great difficulty meeting the pitch motion criteria" and asked whether pitch criteria would "be revised in the final [solicitation]."  AR at 88-19256.  NAVSEA answered that it would not modify the criteria, but would instead "assess the risks associated with not meeting those specific criteria." AR 88-19256; *see also* AR 88-19276 to 77.  This language, however, does not appear within the solicitation, but the government did include a general note that answers to industry questions regarding the draft solicitation could be found on the government's Federal Business Opportunities website.  AR 19-1022.

[11]Sea States are rated on a scale from 0 (calm) to 9 (phenomenal, 14 or more meters of wave height).  Sea State 5 corresponds to rough seas of 2.5 to 4 meters.  Sea State 6 corresponds to very rough seas of 4 to 6 meters.  *See* World Meteorological Org., Manual on Codes I.1, Part A, WMO-No. 306 at A-326 (2017), http://www.wmo.int/pages/prog/www/WMOCodes/wmo306_VI1/VolumeI.1.html.

requirements was "probably achievable by a commercial vessel in mid Sea State 5" and recommended specifying mid Sea State 5 for the towing and transit missions.  AR 91-19364; *see also* AR 93-19525.  The subsequent solicitation consequently set seakeeping parameters using mid Sea State 5 for towing and transit and a lower transit speed of 11 knots.  AR 10a-362 (using 3.25m for wave height).[12]

The solicitation required that all requirements "be verified as having been met . . .  in accordance with regulatory and classification requirements, with the [Society of Naval Architects and Marine Engineers] [Technical and Research] Bulletin No. 3-39 [Guide for Shop and Installation Tests] [and] No. 3-47 [Guide to Sea Trials] and with [c]ontractor defined and [g]overnment approved procedures that provide assurance that the [Circular of Requirements] has been satisfied."  AR 10a-412.  Specific to seakeeping, the solicitation required reported abilities "be verified by analysis," AR 10a-413, and be presented by "a table similar to Table 3.070g-1 of the T-ATS [circular of requirements attachment to the solicitation]," AR 19-1180; *see also* AR 10a-361 to 62 (Table 3.070g-1).  By analysis, NAVSEA meant the use of "established technical or mathematical models or simulations [validated by generally recognized industry standards], algorithms, charts, graphs, circuit diagrams, or other scientific principles and procedures."  AR 10a-412.  The solicitation specified three percentile values for the given sea state, provided the maximum wave height and wind speed, specified ship speed and headings for each mission relative to the seas in which the requirements applied, and required use of the Bretschneider wave spectrum.  AR 10a-361 to 62.[13]

For Factor 4.0 – Past Performance, the solicitation discussed which types of projects the government would deem most relevant and how the government would evaluate prior performance.  Offerors could submit no more than five contracts for their past design and construction work and five for those of significant subcontractors in design and construction, none older than 10 years.  AR 19-1185.  Previous work on towing vessels of "similar mission and complexity" was most relevant, followed by "offshore supply vessels of similar complexity," followed by "other ships of similar complexity."  AR 19-1198.  Completed contracts were to be deemed more relevant than open contracts with uncompleted deliveries or ongoing contracts.  AR 19-1198.  The government would also evaluate performance of past projects based on adherence to cost, schedule, and performance requirements, and "business-like concern for the interest of its customers," among other criteria.  AR 19-1198.  The government "reserve[d] the

---

[12]In January 2018, pre-award, NAVSEA re-evaluated the indicative design using the solicitation criteria.  AR 90-19355 to 57.  This analysis found that the indicative design met all seakeeping requirements except for slightly exceeding pitch in the towing mission.  AR 90-19357.

[13]As part of delivery of Contract Line Item 0002, the contractor was to provide a Seakeeping Performance Report "using the Ship Motion Program (SMP) or VisualSMP and shall include calculations of seakeeping performance for all required criteria, loading conditions, and operability indices . . . ."  AR 10a-459 to 60; *see also*, *e.g.*, AR 19-1045, 1048 to 49.  This requirement does not appear to apply to proposal submissions, as its language refers to the awardee.  *E.g.*, AR 19-1048 ("The Contractor shall prepare . . . ."), 1054 (same).

right to obtain information for . . . evaluation of past performance from any and all sources." AR 19-1198.  The solicitation does not specify which contracts to submit for evaluation of past performance.  AR 19-1185 to 87.

## C.  *Initial and Revised Proposals and NAVSEA's Evaluation*

NAVSEA received five proposals, all of which were timely.  AR 28-7004.  The Evaluation Board produced its report evaluating the initial proposals in August 2017.  AR 28-6998 to 7170.  The Evaluation Board completed an evaluation of four of the five proposals and suspended evaluation of the fifth proposal for failure to meet material requirements of Factor 1.0.  AR 28-7007.[14]  For the four evaluated proposals, the Evaluation Board documented strengths, weaknesses, significant weaknesses, risks, and deficiencies, and prepared discussion questions.  AR 28-7008 to 7170.  The Advisory Council found the four proposals evaluated by the Evaluation Board to be within the competitive range and recommended holding discussions with each.  AR 29-7174.  The Selection Authority concurred with the Advisory Council on September 14, 2017.  AR 30-7177.  On September 29, 2017, NAVSEA notified one offeror it had been removed from the competitive range and began discussions with the remaining four offerors.  AR 31-7178 (notice of elimination); AR 32-7180 (opening of discussions); AR 33-7193 (same); AR 34-7211 (same); AR 35-7231 (same).

Discussions closed on November 21, 2017, with NAVSEA notifying each of the four remaining offerors of unresolved issues and that revised proposals were due by December 7, 2017.  AR 43-8559 to 60; AR 44-8577 to 78; AR 45-8597 to 98; AR 46-8654 to 55.  All four submitted timely revised proposals, *see* AR 47-8671; AR 48-10135; AR 49-11315; AR 50-12581, and remained within the competitive range, AR 55-15111 to 12.  The Evaluation Board produced its final report evaluating the remaining four proposals on February 8, 2018, reviewing each previously documented strength, weakness, and deficiency against the revised proposals.  AR 52-13829 to 14041.  In the course of its discussions, the Evaluation Board asked the four offerors a total of 183 questions regarding their technical proposals and 11 regarding costs.  AR 55-15111.

### 1.  *Evaluation Board's final review of Gulf Island's proposal.*

Gulf Island proposed a ship measuring [***] meters in overall length and [***] meters at the beam, and displacing [***] metric tons at full load.  AR 48a-10151 to 52.  Gulf Island's proposal lengthened by [***] meters a previous design it had constructed [***] times between 2015 and 2016.  AR 48a-10153.[15]  Gulf Island's total evaluated price was $496,245,192, making it the second lowest bidder at approximately 1% more than the lowest bid by Thoma-Sea.  AR

---

[14]The fifth proposal was also well outside the maximum award amount for every ship.  *Compare* AR 28-7158, *with* AR 19-1040, 1187.

[15]Gulf Island had also constructed [***] other vessels of a similar size and design between 2006 and 2012.  AR 48a-10153.

52-14015.[16]  Overall, the Evaluation Board rated Gulf Island's proposal as "Good" in the Ship Design, Production, and Management factors, found Gulf Island's past performance to be "Very Relevant," and had "Satisfactory Confidence" in Gulf Island's ability to complete the contract. AR 52-13840.

The Evaluation Board noted 14 strengths specific to Factor 1.0 – ship design, "the most significant of these [involved] bollard pull of [***] short tons," well in excess of the required minimum 130 short tons.  AR 52-13887 to 90.  The Evaluation Board also noted that Gulf Island's parent design "is a mature/proven parent design with a proven operational history," that the proposed design "exceeds all of the seakeeping requirements, [which] will allow for better handling of the vessel and safer [working] conditions," and that the design provides [***] square meters of working deck and [***] cubic meters of salvage stowage space, well in excess of the minimum 465 square meters and 680 cubic meters required, respectively.  AR 52-13888 to 90.  Gulf Island's proposal claimed that it could meet all seakeeping requirements, having used the [***] software program to perform the analysis and presenting its seakeeping information in a table conforming to the solicitation's specification.  AR 48a-10176; *see also* AR 10a-361 to 62 (presentation requirement).  The ship design weaknesses and risks included using an engine that was not certified to comply with emission requirements, a less than desired air conditioning capacity, a lack of heating provided to the galley and engine control room, and a discrepancy in its seakeeping tables regarding assessed wind speed.  AR 52-13890 to 902.[17]

Regarding Factor 4.0 – past performance, Gulf Island provided five contracts showing its work, of which two were rated "very relevant," one was "relevant," and two were "somewhat relevant."  AR 52-13922; *see also* AR 48b-10385 to 86.  One project found "very relevant" involved work performed in 2012 as a subcontractor for the construction of an $18.3 million 197-foot offshore support vessel.  AR 48b-10385 to 86; AR 52-13923.  The Evaluation Board noted that while this project did not "appear to involve design work [by Gulf Island]," Gulf Island "performed a majority of the construction effort . . . [, which demonstrated] successful performance of construction work with a very similar ship type."  AR 52-13923.  The second "very relevant" contract involved a $17.7 million construction project in 2014 of a 204-foot offshore support vessel of "similar size and complexity to the T-ATS [with a] scope of work [] essentially the same as [for the T-ATS]."  AR 52-13924; *see also* AR 48b-10385 to 86.  The one "relevant" project was a $14.7 million project for Hornbeck Offshore in 2015 to convert an offshore supply vessel to a multi-purpose support vessel, which "demonstrate[d] successful performance of design and general construction work with commercial ship types that are similar to the T-ATS."  AR 52-13924; *see also* AR 48b-10385 to 86.  The two "somewhat relevant" projects involved construction of $41.6 million and $32.5 million workboats with similar

---

[16]To arrive at total evaluated price, the government subtracted from the offeror's bid an established amount for meeting each of four specified desired capabilities.  AR 52-14013 to 14 (Evaluation Board report); AR 19-1199 (solicitation).

[17]Regarding the seakeeping discrepancy, one table provided by Gulf Island indicated that its analysis used 47 knots of wind and the other 27 knots.  AR 52-13901.  The original solicitation mistakenly used 47 knots, but was later corrected to 27 knots.  AR 52-13901.

functions as relevant classes of vessels, but with "very different hull form[s] from the T-ATS." AR 52-13923 to 24; *see also* AR 48b-10385 to 86.  The Evaluation Board noted Gulf Island's reputation for good reliability, quality, and customer relations.  AR 52-13926 to 27.  Gulf Island also provided five contracts for two of its major subcontractors, three of which received "very relevant" ratings and two received "relevant."  AR 52-13922; *see also* AR 48b-10387 to 88.

Three Gulf Island customers submitted Past Performance Questionnaires detailing the scope of work performed by Gulf Island on contracts provided as part of its past performance evaluation.  AR 42c-8425 to 42.[18]  Hornbeck Offshore completed one such questionnaire on June 9, 2017, regarding the offshore support vessel conversion project performed in 2014 and 2015.  AR 42c-8434 to 36.  Hornbeck gave favorable ratings and comments regarding Gulf Island's performance of the offshore supply vessel conversion project, and also noted that Gulf Island "has successfully completed 26 other major . . . projects [valued at] $47,634,254 over the past three years." AR 42c-8434 to 36.   Hornbeck further opined that Gulf Island has been "fair and professional in all dealings," has a "customer first mentality at all times," and "has high potential to provide great value to the public."  AR 42c-8436.

 2. *Evaluation Board's review of Thoma-Sea's final proposal.*

Thoma-Sea proposed a ship measuring [***] meters in overall length and [***] meters at the beam.  AR 50-12601.  Thoma-Sea's proposal lengthened by [***] meters a previous design it had constructed [***] times.  AR 50-12597.  Thoma-Sea's proposal provided [***] short tons of bollard pull and provided [***] square meters of working deck.  AR 50-12597; AR 50b-13060 to 62.  Regarding seakeeping abilities, which Thoma-Sea calculated using the [***] software used by the Navy, Thoma-Sea's proposal exceeded the maximum pitch criteria in the transit and towing missions by [***] and [***] degrees, respectively.  AR 50b-13365, 13380.  Apart from pitch in the towing and transit mission settings, and aft deck wetness instances per hour in the transit mission, Thoma-Sea's design met the remaining seakeeping requirements.  AR 50b-13365, 13380.  Thoma-Sea's total evaluated price was $491,289,475, making it the lowest bidder by approximately 1%.  AR 52-14015.  Overall, the Evaluation Board rated Thoma-Sea's proposal as "Good" in the Ship Design, Production, and Management factors, found Thoma-Sea's past performance to be "Very Relevant," and had "Substantial Confidence" in Thoma-Sea's ability to complete the contract.  AR 52-13840.

The Evaluation Board noted 12 strengths specific to Factor 1.0 – ship design, including using a "mature, proven parent design with 5 major variants . . . for a total of [***] vessels delivered" and employing mature main engines already used in some Navy ships.  AR 52-13979 to 80.  The Evaluation Board identified only two ship design risks in the final proposal, mainly uncertainty over the proposed sustained speed.  AR 52-13984 to 85.  The Evaluation Board also initially noted that several of Thoma-Sea's seakeeping figures "appear[ed] to be extremely high," specifically acceleration and deck wetness instances.  AR 52-13981.  The Evaluation Board discussed these weaknesses with Thoma-Sea, which then provided a revised seakeeping table for the final proposal that "resolved" the weaknesses.  AR 52-13981.  The Evaluation Board

---

[18]Two customers of major subcontractors also completed a questionnaire, each rating a major Gulf Island subcontractor for whom Gulf Island submitted contracts.  AR 42c-8425 to 28 ([***]), 8440-8442 ([***]).

determined a "low risk" from Thoma-Sea's proposal exceeding the pitch requirements with "minimal" operational impact, as the risk could be mitigated by adjusting course and speed.  AR 52-13981.

For Factor 4.0 – past performance, Thoma-Sea provided four contracts, all of which were rated "very relevant" or "relevant."  AR 52-14005.  The three "very relevant" contracts involved construction projects of similar scope to the T-ATS for three different customers.  AR 52-14005. Thoma-Sea had produced two 310-foot offshore supply vessels at approximately $51.7 million each for Tidewater Marine, AR 52-14006; *see also* AR 50-12798 to 99, one 190-foot offshore survey vessel valued at $19.1 million for Fugro Geo Services, AR 52-14006 to 07; *see also* AR 50-12801 to 02, and two 276-foot offshore support vessels for Gulf Offshore Logistics costing $37.4 million each, AR 52-14007; *see also* AR 50-12804 to 05.  The "relevant" contract involved the $8.4 million construction of a 120-foot survey vessel under a foreign military sales contract with the Navy.  AR 52-14007; *see also* AR 50-12807 to 08.  Thoma-Sea also provided three contracts for one of its major subcontractors, of which two of the three received "very relevant" ratings while one was "somewhat relevant."  AR 52-14005, 14007 to 08.  The Evaluation Board had only positive remarks about Thoma-Sea's past performance, such as performing on time and on budget and having a good working relationship with its major subcontractor.  AR 52-14008 to 09.

### 3.  *Evaluation Board's final review of remaining proposals.*

The third bidder received final ratings equivalent to Thoma-Sea's in Factors 1.0 to 4.0, but at approximately 13% higher cost.  AR 55-15112.[19]  The fourth bidder received a rating lower than Thoma-Sea for Factor 2.0 – Production, Factor 3.0 – Management, and Factor 4.0 – Past performance, and bid nearly 9% above Thoma-Sea.  AR 55-15112.[20]

---

[19]The third bidder proposed a ship measuring [***] meters in overall length and [***] meters at the beam.  AR 47a-8698.  Specific to Factor 1.0 – ship design, the Evaluation Board noted several strengths, including a working deck of [***] square meters, (well in excess of the 465 square meters required), [***], an [***], and [***] than required.  AR 52-13852, 13854. The Evaluation Board also noted several ship design weaknesses, such as exceeding the maximum pitch requirement in the towing mission by [***]% and delivering only the minimum 130 short tons of bollard pull.  AR 52-13855 to 56, 13860; AR 47a-8812.  The third bidder provided five contracts showing its work and four for subcontractors, eight of which received "very relevant" ratings.  AR 52-13881 to 84.  The Evaluation Board noted several strengths showing [***].  AR 52-13884 to 85.

[20]The fourth bidder proposed a ship measuring [***] meters in overall length and [***] meters at the beam.  AR 49b-11435 to 36.  Specific to Factor 1.0 – ship design, the Evaluation Board noted several strengths, including [***] and [***].  AR 52-13930.  The Evaluation Board also noted several weaknesses, such as exceeding the number of keel slams and deck wetness instances in the transit mission under one wave period and exceeding the number of deck wetness instances in the towing mission under two wave periods.  AR 52-13936; AR 49b-11443. The design, however, was within the maximum pitch requirements. AR 49b-11443.  The proposed design could only deliver 132 short tons of bollard pull, had a working deck of [***]

Regarding seakeeping performance, bidder three's proposal met all of the seakeeping requirements except for pitch during the towing mission. AR 47a-8812; *see also* AR 10a-362. The Evaluation Board found the risk of exceeding pitch in one mission as "negligible" and "low risk." AR 52-13856. Bidder four's proposal met all of the seakeeping requirements except for keel slams per hour during the transit mission and hourly aft deck wetness instances in the transit and towing missions. AR 49b-11443. Bidder four met all pitch requirements, though aft deck wetness instances exceeded the desired maximum by double or triple. AR 49b-11443.

Only Gulf Island's proposal met all seakeeping requirements, though the remaining three met most requirements, deviations were generally small, and one of the three met all pitch requirements.

D. *Advisory Council's Review, Award Decision, & Post-Award Debriefing*

The Advisory Council reviewed the Evaluation Board's report, briefing the Selection Authority of its recommendations on February 20, 2018, and producing a written evaluation containing its best value determination to the Selection Authority on February 23, 2018. AR 53-14042 (briefing); AR 55-15109 (report). The Advisory Council "concur[red] with all the [Evaluation Board] ratings" except for the Factor 1.0 – ship design rating assigned to Gulf Island. AR 55-15111 to 12. The Advisory Council elevated Gulf Island's rating for ship design from "Good" to "Outstanding" "based on the exceptional approach and understanding of the requirements, multiple strengths and low risk of unsuccessful performance." AR 55-15115.

The Advisory Council, in the report section specific to Gulf Island's proposal, "found the following [three ship design strengths] to be of significant value to the [g]overnment: 1) a bollard pull . . . which significantly exceeds the minimum requirement . . . ; 2) a larger working deck . . . which significantly exceeds the minimum requirement . . . ; and 3) the design exceeds all seakeeping requirements . . . ." AR 55-15115 to 16. "[E]xceeding these two mandatory requirements and the seakeeping requirement [is] critical to the primary . . . missions of the ship [and] not only provides significant value but also demonstrates an exceptional approach and understanding of the requirements while providing sufficient margin to mitigate performance risk to a 'low' rating." AR 55-15116. The Advisory Council found "[n]o deficiencies or significant weaknesses," while the "multiple strengths and margins [regarding ship design] . . . combined with providing all the desired capabilities and the excellent seakeeping characteristics . . . substantially more than offset the [less significant] weaknesses and risks." AR 55-15116. The Advisory Council found a low to moderate risk of unsuccessful contract performance in the first three factors and had "satisfactory confidence" that Gulf Island could perform successfully, AR 55-15116 to 18, and noted that a Defense Contract Management Agency's review of Gulf Island had found "the level of financial risk to performance . . . to be [m]oderate on a scale of low-moderate high." AR 55-15118; *see also* AR 59b-15160 (financial review). In the report's

square meters, and guaranteed at least [***] nautical mile endurance, all near the minimum required. AR 49b-11436, 12145 to 46. The fourth bidder provided one contract showing work that was deemed "somewhat relevant" and three for subcontractors, two of which were deemed "very relevant." AR 52-13973 to 74. The Evaluation Board noted that the previous work was within schedule and budget, but that the T-ATS would be larger and complex than any other vessel it had built. AR 52-13976 to 77.

14

best-value section, the Advisory Council also mentioned Gulf Island's "low risk of unsuccessful performance" specific to Factor 1.0 as a fourth reason for upgrading Gulf Island's rating for the ship design factor.  AR 55-15125.

The Advisory Council concurred with the Evaluation Board regarding Thoma-Sea, similarly expressing "substantial confidence" that Thoma-Sea could perform the contract based on its past performance.  AR 55-15124.  The Advisory Council also noted that the risk of unsuccessful performance was low to moderate regarding Factors 2.0 and 3.0, but found a moderate to high ship design risk due to the use of a "propulsion plant [that had] not previously been integrated into the parent design, and [thus] has no combined operational history and involves a redesign of the machinery arrangement."  AR 55-15122 to 24.  Further, the Defense Contract Management Agency "did not find [Thoma-Sea] to be financially capable of performing on the contract" and recommended against award having assessed "the level of financial risk to performance . . . to be [h]igh."  AR 55-15124; *see also* AR 59d-15194 (financial review).

The Advisory Council recommended Gulf Island's proposal as providing the best value for the government and recommended Gulf Island be awarded the contract.  AR 55-15124, 15127.  The Advisory Council found Gulf Island's proposal represented the "highest rated proposal when considering the non-price factors," AR 55-15125, as Gulf Island's "Outstanding" rating for Factor 1.0 – ship design represented the "most important evaluation [f]actor," and thus outweighed the better ratings given to both Thoma-Sea and Bidder three in Factor 4.0 – past performance, AR 55-15125.  Regarding price, the Advisory Council noted that non-price factors "are significantly more important than price" and expressed concern in its tradeoff discussion over the high financial risk to performance assessed to Thoma-Sea.  AR 15-15126.  The Advisory Council thus concluded that the 1% lower price offered by Thoma-Sea and its better rating in Factor 4.0 did not offset the ship design strengths offered by Gulf Island.  AR 55-15126 to 27.  The Advisory Council also determined that among the remaining three bidders, Thoma-Sea proposed the next most advantageous proposal.   AR 55-15126 to 27.

On February 21, 2018, the Contracting Officer determined Gulf Island "to be responsible in accordance with FAR [48 C.F.R. §] 9.104-1."  AR 54-14049.  The Contracting Officer based her determination on financial assessments, a site visit conducted on February 3, 2017,[21] the ability to post required bonds, Gulf Island's past performance record as assessed by the Evaluation Board, and a review of government contracting databases showing a "satisfactory record of integrity and business ethics."  AR 54-14049 to 50.  The February 2017 site visit report found that Gulf Island "would [likely] qualify for [the] T-ATS [project], but expressed several concerns with Gulf Island's staffing levels and administrative abilities" with respect to a government contract.  AR 54-14097.

---

[21]The site visit occurred pre-solicitation "during the market research phase to determine if the small businesses interested in the solicitation were capable of meeting the [forthcoming solicitation] requirements."  AR 54-14049.  The source selection plan contemplated visiting offerors as "deemed necessary by the Contracting Officer" to verify production ability.  AR 7-132, 146.

The responsibility determination mentioned two financial assessments.  First, the Navy requested a financial assessment from Dun & Bradstreet, which the Navy received in January 2017.  AR 54-14072.  Dun & Bradstreet assessed Gulf Island's overall business risk as "moderate" and recommended a maximum credit limit of $25,000.  AR 54-14072.  The assessment also reported Gulf Island as being formed in 2015 and having one employee.  Yet, Gulf Island represented five months later that it employed 450 employees, operated three shipyards, and had more than 60 years of experience, while the Navy's site visit a month after the Dun & Bradstreet assessment reported around 200 employees.  *Compare* AR 54-14072 (Dun & Bradstreet analysis), *with* AR 23a-3845 (experience and employees), 3892 (shipyards), *and* AR 54-14094 to 95 (employees).[22]  Second, following the Evaluation Board's initial report, NAVSEA requested a pre-award financial capability survey from the Defense Contract Management Agency.  AR 54-14053.  The survey was completed on October 20, 2017, was released to the contracting officer on January 18, 2018, and concluded that Gulf Island was financially capable of handling a complete award given a guarantee agreement executed by Gulf Island's parent company.  AR 54-14051 to 52, 14054 to 55.[23]

The Selection Authority reviewed the reports of the Evaluation Board and the Advisory Council and determined on February 27, 2018, that Gulf Island's proposal represented the best value.  AR 56-15129.  The Selection Authority concurred with the Advisory Council's recommendations, noting expressly in his award decision specific attributes of Gulf Island, Thoma-Sea, and bidder three.  AR 56-15130 to 31.[24]  Gulf Island had a better rating than either Thoma-Sea or bidder three for Factor 1.0, the most important factor, owing to a design that "advantageously exceeds [] all [seakeeping requirements]" and provides "significant margins for bollard pull . . . and clear working deck area," all of which "provide significant additional value to the [g]overnment."  AR 56-15130 to 31.  Unlike Gulf Island, neither Thoma-Sea nor bidder three met all seakeeping requirements, but bidder three did provide a large working deck.  AR

---

[22]The Navy obtained a Dun & Bradstreet assessment for Gulf Island dated October 24, 2017, that contains more details than the January 2017 report and shows that Gulf Island employed 200 people.  AR 60b-15233 to 46.  The responsibility determination cites and appends only the January 2017 assessment.  AR 54-14049.  NAVSEA obtained similar assessments for the other three bidders within the competitive range.  AR 60-15206 to 85.

[23]Gulf Island Shipyards, LLC is owned by Gulf Island Fabrication, Inc., a fabricator of steel platforms and structures for the offshore oil and gas industry.  AR 54-14054.  On January 1, 2016, Gulf Island Fabrication, Inc., purchased for cash a shipyard through its wholly-owned subsidiary, Gulf Island Shipyards, LLC.  AR 54-14054; *see also* Gulf Island Shipyards, LLC's Rule 7.1 Disclosure Statement, ECF No. 11.

The Navy requested and received similar surveys for the other three bidders within the competitive range.  AR 59-15145 to 205.  Notably, the Defense Contract Management Agency recommended against award to Thoma-Sea due to a high financial risk.  AR 59d-15194.

[24]The Selection Authority concurred with an "unacceptable" rating given to bidder four, which made it ineligible for award.  AR 56-15130.  The Selection Authority's award decision did not further discuss bidder four.

56-15130 to 31.  Gulf Island received a lower rating than both Thoma-Sea and bidder three on
Factor 4.0 (past-performance), the second most important factor.  AR 56-15130 to 31.  All three
had comparable ratings for Factors 2.0 (production) and 3.0 (management).  AR 56-15130 to 31.
Both Thoma-Sea and Gulf Island provided all four desired capabilities whereas bidder three
provided none.  AR 56-15130 to 31.  Thoma-Sea offered the best price, with Gulf Island and
bidder three's price 1% and 13% higher, respectively.  AR 56-15130 to 31.  The award decision
did not note any risks for bidder three, but noted that Thoma-Sea's "financial capability analysis
concluded [a high] level of financial risk to performance" while Gulf Island's proposal had "only
one risk[, which was] inconsequential to the performance of the contract."  AR 56-15130 to 31.
In conclusion, the Selection Authority found that Gulf Island's superior ship design was the only
one to "meet . . . all of the seakeeping requirements" and "provides significant increased
capabilities with respect to mandatory requirements, which when combined with providing or
exceeding all four of the desired capabilities, significantly increase[s] core mission capabilities."
AR 56-15131.  Therefore, the "value associated with [Gulf Island's] proposed design outweighs
the 1% price premium."  AR 56-15131.

| Evaluation History at Contract Award (March 2018) | | | | |
|---|---|---|---|---|
| | **Gulf Island** | **Thoma-Sea** | **Bidder three** | **Bidder four** |
| **Factor 1.0**<br><br>Ship Design | EB: Good<br><br>AC: Outstanding | EB: Good<br><br>AC: Good | EB: Good<br><br>AC: Good | EB: Good<br><br>AC: Good |
| **Factor 2.0**<br><br>Production | EB: Good<br><br>AC: Good | EB: Good<br><br>AC: Good | EB: Good<br><br>AC: Good | EB: Marginal<br><br>AC: Marginal |
| **Factor 3.0**<br><br>Management | EB: Good<br><br>AC: Good | EB: Good<br><br>AC: Good | EB: Good<br><br>AC: Good | EB: Unacceptable<br><br>AC: Unacceptable |
| **Factor 4.0**<br>Past Performance | Very Relevant /<br>Satisfactory<br>confidence | Very Relevant /<br>Substantial<br>confidence | Very Relevant /<br>Substantial<br>confidence | Relevant /<br>Satisfactory<br>confidence |
| **Factor 5.0**<br><br>Price | $ 496,265,192 | $ 491,289,475 | $ [***] | $ [***] |
| EB: Evaluation Board      AC: Advisory Council | | | | |

NAVSEA notified all five original offerors of Gulf Island's award on March 9, 2018.
AR 63-15307 to 16.  Gulf Island received official notification of the award and the signed
contract on March 16, 2018.  AR 65-15327 to 29 (notification); AR 66-15330 to 16185
(contract).  The Contracting Officer also sent individual letters on March 16, 2018 to the three

unsuccessful final offerors, providing a brief description of the five evaluation factors and a chart showing how their proposal rated compared to Gulf Island's.  AR 64-15317 to 26.

NAVSEA conducted a debriefing in writing at the request of the losing offerors.  On March 26, 2018, the Contracting Officer sent the three unsuccessful final offerors a debriefing package, which consisted of (1) a PowerPoint presentation consisting of generic descriptions of the evaluation process with slides showing how NAVSEA calculated the offeror's total evaluated price and a basic comparison of evaluation ratings to Gulf Island, and (2) a technical debrief consisting of a list of the proposal's strengths, weaknesses, significant weaknesses, deficiencies, and risk for each of the technical factors.  *See, e.g.*, AR 69-16308 to 42 (debriefing package for Thoma-Sea as provided on March 26, 2018).  The packages and NAVSEA's subsequent responses to any timely questions constituted the entirety of the post-award debriefing.  *E.g.*, AR 69b-16310 (debriefing package transmittal letter).  All unsuccessful bidders submitted written questions, *see* AR 67d-16220 to 23 (bidder three on March 28, 2018); AR 68d-16271 to 73 (bidder four on March 27, 2018); AR 69e-16343 to 44 (Thoma-Sea on March 28, 2018), to which the Contracting Officer responded in writing, *see* AR 67e, f-16224 to 31(NAVSEA response to bidder three on April 4, 2018); AR 68d-16271 to 73 (NAVSEA response to bidder four on April 2, 2018); AR 69f, g-16345 to 50 (NAVSEA response to Thoma-Sea on April 4, 2018).

Bidder three asked 13 questions, many seeking clarification on how NAVSEA arrived at the ratings assigned to it.  *See* AR 67d-16220 to 21.  Specific to Gulf Island, bidder three asked "how [] the attached [Gulf Island] 8-K report filed with the Securities and Exchange Commission impact[ed] the award decision," and then provided Gulf Island's 8-K filing of March 23, 2018. AR 67d-16220 to 23.  The 8-K stated that Gulf Island's parent company "received a letter of termination from a customer [*i.e.*, Hornbeck] within its Shipyard Division related to the construction of two-multi-purpose service vessels . . . [that the company] referenced in its annual report on Form 10-K . . . filed . . . on March 9, 2018[, but that] [t]he [c]ompany disputes the purported termination and disagrees with the customer's reasons."  AR 67d-16222 to 23.  As with other questions directed at Gulf Island's proposal, the government noted that it "does not discuss the particulars of an offeror's evaluation with another offeror," but that for Factor 4.0, the "[g]overnment considered all of the Past Performance information it had for each offeror."  AR 67f-16226.

Thoma-Sea posed two questions, first asking what prevented it from obtaining an "outstanding" rating for Factor 1.0.  AR 69g-16347 to 50.  NAVSEA specifically noted three risks: a diesel plant that had yet to be integrated into the parent hull or its variants, conflicting speed values, and failure to meet "nonmandatory pitch requirements in the transit and towing missions in certain conditions."  AR 69g-16348.  Second, Thoma-Sea noted that since only Gulf Island met all seakeeping requirements, but that all vessels would be of similar length and displacement, "pitch results would be similar" and thus NAVSEA should have "subject[ed] [Gulf Island's proposal] to detailed independent verification by the [g]overnment before contract award."  AR 69g-16349.  Thoma-Sea then discussed how it evaluated Gulf Island's parent design using seakeeping software used by the Navy.  It had concluded that Gulf Island's proposal could only meet the pitch requirements by "manipulating the input parameters into the [seakeeping analysis software]," such as by "unrealistically lower[ing]" the pitch gyradius or by "only selecting most favorable operating drafts."  AR 69g-16349.  Finally, Thoma-Sea asked

18

NAVSEA to confirm whether it conducted an independent seakeeping analysis and validated Gulf Island's seakeeping claims.  AR 69g-16350.  NAVSEA responded that it "evaluated the information provided by each [o]fferor in its proposal, including the seakeeping performance characteristics," that the government's evaluation followed the solicitation, and that offerors were required to provide accurate information.  AR 69g-16350.

### E.  *Thoma-Sea's Post-Award Protests Before GAO*

Thoma-Sea filed a protest before the Government Accountability Office ("GAO") on April 9, 2018.  AR 70-16351.  In the protest, Thoma-Sea first alleged that NAVSEA failed to account for publicly available information showing Gulf Island's poor contract performance when evaluating Gulf Island's past performance and responsibility.  AR 70-16353, 16357 to 61.  Thoma-Sea cited the termination of a shipbuilding contract by Hornbeck Offshore and offered "personal knowledge of Gulf Island's failure to perform contracts," such as a failure to deliver to Tidewater, Inc.  AR 70-16358; AR 70a-16407 (affidavit of Walter Thomassie (Apr. 4, 2018)).  Second, Thoma-Sea alleged errors in NAVSEA's evaluation of its production proposal, in which Thoma-Sea had received a "good" rating, arguing that NAVSEA improperly downgraded its rating for Factor 2.0 based on unstated criteria involving certification of dry docks and the depth of the water between two of Thoma-Sea's production facilities.  AR 70-16353 to 54.  Third, Thoma-Sea alleged NAVSEA failed to properly evaluate Thoma-Sea's ship design, for which Thoma-Sea received a "good" rating, "in that [NAVSEA] improperly downgraded [its] rating due to [the three] perceived risks" identified by the Contracting Officer in response to Thoma-Sea's debriefing questions.  AR 70-16354.  Thoma-Sea alleged error because the 12 strengths documented by NAVSEA outnumbered the three risks, NAVSEA failed to account for numerous other "exceptional aspects," and NAVSEA applied unstated evaluation criteria in finding risk from Thoma-Sea using a propulsion system that had not previously been integrated into the parent design.  AR 70-16366 to 68.  Further, Thoma-Sea claimed NAVSEA erred by designating Thoma-Sea's inability to meet pitch requirements as a risk and "downgrading" its proposal because seakeeping requirements were non-mandatory and Thoma-Sea complied with 96% of the non-mandatory requirements.  AR 70-16373 to 74.  Fourth, it contended that because of the first three errors and a disregard for Thoma-Sea's superior price and past performance, NAVSEA conducted a flawed tradeoff analysis.  AR 70-16354.  Thoma-Sea did not challenge Gulf Island's ship design or its "outstanding" rating for ship design.

Upon Thoma-Sea's receipt of NAVSEA's procurement report, Thoma-Sea elaborated its claims before GAO.  Thoma-Sea alleged that NAVSEA acted arbitrarily and contrary to the solicitation when the Advisory Council and the Selection Authority "at the 11th hour" "overruled the [Evaluation Board]" to upgrade Gulf Island's ship design, "[a]pparently aware that [the upgrade] was required to overcome [Gulf Island's] higher price and inferior past performance." AR 76-19008.  According to Thoma-Sea, the solicitation "does not provide for a hierarchy in which the [Selection Authority] can unilaterally overrule the reasoned conclusions of the [Evaluation Board]," and even if it did, the change lacked justification because Thoma-Sea "alleged and conclusively demonstrated [that] any vessel that meets the vessel design indicated in the [solicitation] will be *unable* to meet (let alone exceed) all of the seakeeping requirements." AR 76-19011 to 13 (emphasis in original).  Thoma-Sea also contended that none of the past performance projects provided by Gulf Island were of equivalent magnitude, where Thoma-Sea equated magnitude with cost of past projects per vessel.  AR 76-19015 to 17 (table comparing

Gulf Island's project cost per vessel against the solicitations' approximate cost per vessel). Finally, Thoma-Sea argued that NAVSEA failed to exercise due diligence by not investigating Gulf Island's financial risk upon reviewing reports from Dun & Bradstreet about Gulf Island's finances.  AR 76-19019 to 20.

GAO issued its decision on July 16, 2018, rejecting Thoma-Sea's contentions.  AR 80-19086.  GAO found that Thoma-Sea abandoned its arguments about being evaluated improperly for the ship design and production factors by failing to rebut NAVSEA's responses to these allegations.  AR 80-19091 n.6.  GAO also rejected Thoma-Sea's claim that magnitude referred only to the dollar amount of the contract. AR 80-19092.  GAO next rejected the contention that NAVSEA failed to evaluate Gulf Island's termination dispute with Hornbeck Offshore because "all of the evidence presented by Thoma-Sea is dated after . . . the contracting officer finalized her affirmative responsibility determination." AR 80-19092 to 93, 19095.  Regarding Thoma-Sea's arguments of arbitrariness in the upgrade of Gulf Island's ship design rating, GAO found the decision "documented in the record, reasonable, and consistent with the [solicitation]."  AR 80-19096.  Further, GAO dismissed as untimely Thoma-Sea's claim that Gulf Island could not meet the pitch requirements, as Thoma-Sea first raised these arguments on May 21, 2018, despite knowing of them by April 4, 2018.  AR 80-19097.

F.  *Thoma-Sea's Instant Protest and NAVSEA's Review on Voluntary Remand*

Thoma-Sea commenced its instant protest in this court by filing its complaint on August 6, 2018.  Four days later, this court granted the government's unopposed motion for a 21-day voluntary remand. Am. Order for Remand (Aug. 10, 2018), ECF No. 22.  During the remand period, NAVSEA examined three aspects of the procurement: (1) whether Gulf Island remained a responsible offeror given allegations by Thoma-Sea of poor performance in previous contracts with Tidewater and Hornbeck, (2) whether NAVSEA erred in its original past performance assessment, and (3) whether NAVSEA properly assessed seakeeping claims.

The Contracting Officer was unaware of the performance allegations regarding Gulf Island's contracts with Tidewater and Hornbeck when she made the original responsibility determination.  AR 84-19107.  On August 14, 2018, she held an "executive level meeting with [Gulf Island's] senior management team to ascertain the nature of alleged performance issues [regarding] the Tidewater and Hornbeck contracts."  AR 84-19107.  The Contracting Officer also discussed Gulf Island's cash position and debt.  AR 84-19107.  Subsequent to the meeting, Gulf Island provided, at NAVSEA's request, a written summary on August 28, 2018, of what Gulf Island had represented orally at the meeting.  AR 84-19107 to 08; *see also* AR 83-19101 to 05.

Gulf Island explained that Tidewater refused to accept two vessels built by Gulf Island due to an investigation into non-conformity with contract specifications, but that after Tidewater entered into and then emerged from bankruptcy, Tidewater accepted the vessels and then further contracted with Gulf Island for the dry storage of eight 250-foot vessels. AR 83-19104; *see also* AR 84-19107.  Regarding Hornbeck, Gulf Island explained that it first received notice of default on December 27, 2017, AR 83-19104 to 08; *see also* AR 84-19107, pre-award but after submission of its final proposal.  Hornbeck issued a termination notice on March 19, 2018, AR

83-19104, post-award.[25]  Near the end of the remand period, Gulf Island's surety, Zurich North America, denied Hornbeck's claim and Gulf Island continues to dispute the termination.  AR 84-19107 to 08; *see also* AR 83-19104.  Gulf Island stated that it assumed both of these contracts when it acquired another shipbuilder.  AR 83-19103 to 04.  There is no indication that the Contracting Officer obtained any new information during remand regarding these disputes other than that provided by Gulf Island during either the site meeting or subsequent written visit summary.

The Contracting Officer also received assurances about Gulf Island's financial health.  Gulf Island represented that it had $[***] million cash on hand with a liquidity of $[***] million and no debt.  AR 84-19107; *see also* AR 83-19105.[26]  The Contracting Officer defended her previous use of the financial surveys completed by the Defense Contract Management Agency and Dun & Bradstreet, stating that "Contracting Officers routinely rely on [these reports]."  AR 84-19108.  Further, she explained that the moderate financial risk assigned to Gulf Island did not raise concern because Gulf Island's risk was the lowest of the four final offerors and "[m]oderate risk ratings are not uncommon for small businesses in this sector."  AR 84-19108.   When combined with Gulf Island's explanation about the two disputed contracts, the Contracting Officer accordingly confirmed Gulf Island "remains responsible in accordance with FAR 9.104-1."  AR 84-19108.

The Evaluation Board re-assessed past performance in "light of the allegations set forth in [Thoma-Sea's protest]," "to include cost information about contracts as a necessary element of 'magnitude.'"  AR 85-19113, 19120.  In the updated report, the Evaluation Board compared the per vessel cost of reported contracts to "the program cost cap of $64.5 [million] per vessel" rather than comparing the total reported contract value to the total award value of approximately $522 million because "small business[es] rarely [build] multiple vessels in the range of the total award value."  AR 85-19120.  Unlike the original Evaluation Board report, the new discussion of past contracts explicitly mentioned price per vessel.  *Compare* AR 52-13923 to 25, *with* AR 85-19132 to 34.

The focus on magnitude resulted in a lower past performance relevance ratings for both Thoma-Sea and Gulf Island, with both reduced from "very relevant" to "relevant."  AR 85-19121 to 22.  Gulf Island saw a downgrade of "very relevant" offshore support vessel contracts to "relevant," contracts valued at $18.3 million and $17.9 million per ship.  *Compare* AR 52-13923 to 24, *with* AR 85-19132 to 33.  Gulf Island's $41.6 million and $32.5 million "somewhat relevant" workboat construction projects that involved "very different hull forms" were upgraded to "relevant," as the new evaluation noted the cost similarity with the T-ATS.  *Compare* AR 52-13923 to 24, *with* AR 85-19132 to 33.  Gulf Island's "relevant" $14.7 million offshore supply vessel conversion project was downgraded to "somewhat relevant" owing to a "significantly smaller" total per-vessel value.  *Compare* AR 52-13924, *with* AR 85-19133 to 34.  Thoma-Sea's

---

[25]The dispute concerned whether Gulf Island had complied with contractual requirements related to electrical engineering and electrical installation.  AR 84-19107.

[26]NAVSEA also apparently reviewed Gulf Island's Second Quarter 2018 10-Q report to the Securities and Exchange Commission to confirm Gulf Island's cash and debt positions.  *See* AR 83-19102.

"very relevant" $103.3 million contract, at $51.7 million per ship, remained "very relevant." *Compare* AR 52-14006, *with* AR 85-9141.  The other two "very relevant" construction contracts, valued at $19.1 and $37.4 million per ship, were downgraded to "relevant."[27] *Compare* AR 52-14006 to 07, *with* AR 85-9141 to 42.  The Evaluation Board downgraded this third contract despite being "essentially the same size and complexity as the T-ATS and "similar in magnitude to the estimated cost of a T-ATS."  AR 85-19142.  Thoma-Sea's fourth contract, an $8.4 million construction of a survey vessel "not similar to the T-ATS in either hull form or material," was downgraded from "relevant" to "somewhat relevant."  *Compare* AR 52-14007, *with* AR 85-19143.  The new evaluation noted that though the "scope of work is similar," the "cost of this vessel is significantly smaller in magnitude than the estimated cost of a T-ATS," AR 85-19143, but no longer mentioned that this project represented "a more complex design [than the T-ATS]," *compare* AR 52-14007, *with* AR 85-19143.

Among individual projects, Gulf Island experienced three downgrades and two upgrades, Thoma-Sea three downgrades and one unchanged, and bidder three two downgrades and three unchanged.  For overall relevancy, Thoma-Sea and Gulf Island were downgraded to "relevant" while bidder three remained "very relevant."  AR 85-19122.  Despite the downgrade to relevancy for Thoma-Sea and Gulf Island, both maintained their original confidence determinations of "Substantial" and "Satisfactory," respectively.  AR 85-19121 to 22.[28]

| Bidder | Project / Vessels | Magnitude (cost) | Complexity / Scope | Feb. 2018 Evaluation | Nov. 2018 Evaluation |
|---|---|---|---|---|---|
| Bidder three | 2 Multi-Purpose Support | $69.7 M / vessel ($139.4 M total) | New construction of similar size involving detail design | Very Relevant | Very Relevant |
| Bidder three | 5 Platform Supply | $53.6 M / vessel ($268.2 M total) | New construction of similar size involving detail design | Very Relevant | Very Relevant |
| Thoma-Sea | 2 Platform Supply | $51.7 M / vessel ($103.3 M total) | New construction of similar size involving detail design | Very Relevant | Very Relevant |
| Bidder three | 2 Offshore Support | $46.2 M / vessel ($92.4 M total) | New construction of similar size involving detail design | Very Relevant | Relevant |
| Gulf Island | 1 Lifeboat (workboat) | $41.6 M / vessel ($41.6 M total) | New construction with some similar missions, but with different and less complex hull form | Somewhat Relevant | Relevant |

[27]This third formerly "very relevant" contract totaled $75.5 million for construction of two ships, of which Thoma-Sea's portion was $74.8 million.  AR 85-19142.

[28]Bidder three's original rating remained unchanged even as 2 projects were downgraded. AR 85-19121 to 23; *see also* AR 85-19124 (new evaluation).  Bidder four, ineligible for award, was not re-examined.  AR 85-19122.

| Thoma-Sea | 2 Offshore Support | $37.4 M / vessel ($74.8 M total) | New construction of similar size involving detail design | Very Relevant | Relevant |
|---|---|---|---|---|---|
| Gulf Island | 1 Lifeboat (workboat) | $32.5 M / vessel ($32.5 M total) | New construction with some similar missions, but with different and less complex hull form | Somewhat Relevant | Relevant |
| Bidder three | 1 Anchor Handling | $30.1 M / vessel ($30.1 M total) | Major repair requiring similar design and construction | Very Relevant | Very Relevant |
| Bidder three | 3 Offshore Support | $28.2 M / vessel ($84.7 M total) | New construction of similar size involving detail design | Very Relevant | Relevant |
| Thoma-Sea | 1 Offshore Survey | $19.1 M / vessel ($19.1 M total) | New construction of smaller size but involving detail design | Very Relevant | Relevant |
| Gulf Island | 1 Offshore Support | $18.3 M / vessel ($18.3 M total) | New construction of smaller size and without detail design but of similar missions and complexity | Very Relevant | Relevant |
| Gulf Island | 2 Offshore Support | $17.9 M / vessel ($35.9 M total) | New construction of smaller size but involving detail design | Very Relevant | Relevant |
| Gulf Island | 1 Multi-Purpose Support | $14.7 M / vessel ($14.7 M total) | Conversion of Offshore Support Vessel involving general construction | Relevant | Somewhat Relevant |
| Thoma-Sea | 1 Survey Vessel | $8.4 M / vessel ($8.4 M total) | New construction of smaller size and different hull form, though perhaps more complex design | Relevant | Somewhat Relevant |

The Evaluation Board also considered Thoma-Sea's allegations of Gulf Island's "'serious performance issues, delays, and conflicts [with] Tidewater, Inc. and Hornbeck Offshore.'" AR 85-19136 to 37. The Evaluation Board noted that Hornbeck completed a past performance questionnaire in which it spoke well of Gulf Island in June 2017, AR 85-19137, while Hornbeck first raised its concerns on December 27, 2017, AR 83-19104. The Evaluation Board also reviewed Gulf Island's statements to the Contracting Officer made during the meeting on August 14, 2018, along with Gulf Island's Second Quarter 2018 10-Q report to the Securities and Exchange Commission. AR 85-19137. With only Thoma-Sea's allegations, Gulf Island's representations, and Gulf Island's 10-Q filing, the Evaluation Board found that it had "insufficient information" to draw conclusions either about the quality of Gulf Island's performance on the Hornbeck and Tidewater contracts or about Gulf Island's future performance risk. AR 85-19137 to 38.

Finally, the Evaluation Board, which included naval architects, also examined Thoma-Sea's allegations regarding seakeeping compliance and analysis.  AR 85-19113.  The Evaluation Board disagreed that Gulf Island's proposed vessel could not comply with seakeeping requirements because a "ship with more length and a larger beam [like Gulf Island's compared to Thoma-Sea's] will generally outperform a shorter, narrower vessel in seakeeping."  AR 85-19113.  The Evaluation Board commented that it had scrutinized dubious seakeeping claims, such as when it questioned Thoma-Sea's unexpectedly high acceleration numbers or bidder four's vague seakeeping caveats.  AR 85-19113; *see also* AR 52-13936 (bidder four), 13981 (Thoma-Sea).  Additionally, the Evaluation Board noted that offerors knew both that the government "would rely on [o]fferors['] proposed information" and that "a detailed seakeeping analysis [was] not required to be provided as part of the proposal."  AR 85-19113 (citing the government's response to draft solicitation T-ATS Industry Study question #63); *see also* AR 88-19255 to 56 (T-ATS Industry Study Question #63); *but see* AR 19-1197 (The solicitation states "the [g]overnment will assess how well the Proposed T-ATS Baseline Design demonstrates that it meets the seakeeping requirements."), 1022 & 1026-27 (The Solicitation notes that the T-ATS Industry Study Questions were publicly available, but were not incorporated in the current solicitation.).  The Evaluation Board concluded that the original ship design ratings "[did] not require any revision[s]."  AR 85-19114.

The Advisory Council concurred with the Evaluation Board's defense of its seakeeping review and the changes to past performance relevancy ratings for Gulf Island and Thoma-Sea.  AR 86-19153 to 56 (Gulf Island), 19161 to 63 (Thoma-Sea).  The Advisory Council also agreed with the Evaluation Board's approach to evaluate magnitude based on cost per vessel rather than overall contract value.  AR 86-19164.  Specifically, the Advisory Council noted that Gulf Island had construction experience for vessels up to [***] feet and for offshore supply vessels, and that information regarding the Tidewater and Hornbeck contracts raised by Thoma-Sea provided "no reason to alter its determination."  AR 86-19156.  The Advisory Council further noted that "[w]hile [Thoma-Sea] has one Very Relevant contract, that one contract is not enough to offset the majority of [its] other contracts . . . [even though it was] similar to the scope, magnitude of effort, and complexities of the T-ATS program."  AR 86-19161 to 62.  The Advisory Council's tradeoff analysis still recommended Gulf Island for the original reasons and noted that Thoma-Sea's proposal was again the second-best.  AR 86-19163 to 66.

The new Selection Authority concurred and again found that Gulf Island's proposal offered the best value based on financial risk, seakeeping abilities, and margins in bollard pull working deck area, notwithstanding Thoma-Sea's better past performance and slightly lower price.  AR 87-19170 to 71.[29]  The Selection Authority also found no fault with the Evaluation Board's review of seakeeping claims.  AR 87-19171.  At the conclusion of the remand period, NAVSEA reconfirmed its award to Gulf Island.  AR 87-19171; Joint Status Report at 1-2 (Sep. 4, 2018), ECF No. 26.

---

[29]The Selection Authority during remand was the chair of the original Advisory Council. *Compare* AR 87-19171 (identifying [***] as the Selection Authority), *with* AR 56-15131 (identifying [***] as the Selection Authority), *and* AR 55-15128 (identifying [***] as the Advisory Council Chair).  The Advisory Council chair during remand was [***], the alternate chair of the Advisory Council during the original evaluation.  AR 55-15128; AR 86-19167.

## JURISDICTION & STANDING

This court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491. The Tucker Act vests this court with jurisdiction to "to render judgment on an action by an interested party objecting to a . . . proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

A threshold issue is whether Thoma-Sea has standing to challenge the cancellation, a burden borne by Thoma-Sea. *See Myers Investigative & Sec. Servs. Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). To demonstrate standing under 28 U.S.C. § 1491(b)(1), a plaintiff must show that it is an "interested party" who suffered prejudice from a significant procurement error. *CliniComp Int'l, Inc. v. United States*, 904 F.3d, 1353, 1358 (Fed. Cir. 2018). An interested party is an actual bidder who had a substantial chance at award of the contract. *See, e.g., id.*; *Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014) (quoting *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013)). An interested party suffers prejudice from a significant procurement error when "*but for the error*, it would have had a substantial chance of securing the contract." *CliniComp*, 904 F.3d at 1358 (emphasis in original).

Thoma-Sea's allegations and the administrative record indicate that Thoma-Sea is an interested party who has sufficiently alleged prejudice. Thoma-Sea underbid Gulf Island by approximately 1%. *See* AR 55-15112. Of the four non-price factors, Thoma-Sea received a slightly lower rating than Gulf Island on Factor 1.0, a comparable rating on Factors 2.0 and 3.0, and a slightly better rating on Factor 4.0, *e.g.*, AR 55-15125 to 27, with Factor 1.0 being the most important factor, *e.g.*, AR 55-15125. Thoma-Sea's proposal's rating matched that of a third bidder in all four non-price factors, but Thoma-Sea underbid the third bidder by approximately 13%. AR 55-15112, 15126; *see also* AR 53-14048. Thoma-Sea achieved higher ratings than the fourth bidder and underbid it by nearly 9%. AR 55-15126; AR 53-14048; *see also* AR 55-15126 (Advisory Council noting that the fourth bidder was ineligible for award due to its "Unacceptable" rating for Factor 3.0). Thoma-Sea alleges that NAVSEA gave erroneous evaluation ratings to both it and Gulf Island and that NAVSEA mistakenly determined that Gulf Island was a responsible contractor. *E.g.*, Am. Compl. ¶¶ 4-10. But for these errors, if assumed true, Thoma-Sea would have likely represented the best value and would have been awarded the contract. *See also* AR 55-15127 (Advisory Council's recommendation that Thoma-Sea's proposal represented the second best offer). Consequently, Thoma-Sea has standing.

## STANDARD OF REVIEW

### A. *Motion for Judgment on the Administrative Record*

The standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, govern the court's review of a protest of the government's decisions regarding award of a contract. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, a court may set aside a government procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to the

traditional balancing test applicable to a grant of equitable relief. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004); *Hyperion*, 115 Fed. Cl. at 550.

The court may not "substitute its judgement for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977))), but "must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *Id.* (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)). The court may overturn the government's procurement decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). In conducting the rational basis analysis, the court looks to whether the "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333), and affords "contracting officers . . . discretion upon a broad range of issues . . . in the procurement process," *AgustaWestland N. Am., Inc., v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (quoting *Impresa Construzioni*, 238 F.3d at 1332-33). Accordingly, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp.*, 554 F.3d at 1037. Relief in protests alleging a violation of regulation or procedure "must show a clear and prejudicial violation." *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333).

## B. *Motion to Supplement the Administrative Record*

In reviewing government procurement decisions, the court must base its review "on the record the agency presents to the reviewing court." *AgustaWestland*, 880 F.3d at 1331 (quoting *Axiom*, 564 F.3d at 1379). "[L]imiting judicial review to the record actually before the agency [guards] against courts using new evidence to 'convert the arbitrary and capricious standard into effectively de novo review.'" *Id.* (quoting *Axiom*, 564 F.3d at 1380) (additional citation omitted). Supplementation of the record must therefore "be limited to cases in which the omission of extra-record evidence precludes effective judicial review," *i.e.*, precludes review "consistent with the APA," which may occur "if the existing record is insufficient to permit meaningful review." *Id.* (quoting *Axiom*, 564 F.3d at 1380-81).[30]

---

[30]If the court determines that effective review requires the introduction of extra-record evidence, the court must then determine the admissibility of the proposed evidence. The proposed evidence must be relevant and its probative value cannot be substantially outweighed by dangers such as unfair prejudice, confusion of the issues, or unnecessary cumulativeness. *See* Fed. R. Evid. 401, 403. And, if it contains opinions or exposition of scientific principles, the witness must be qualified as an expert, whose "scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence," and whose "testimony [must be] based on sufficient facts or data [and] be the product of reliable principles and methods [that are] reliably applied . . . to the facts of this case." Fed. R. Evid. 702.

# ANALYSIS

## A. *Supplementation of the Administrative Record*

At issue regarding supplementation of the administrative record are three sets of submissions, *viz.*, two expert reports by Dr. Brandon Taravella proffered by Thoma-Sea, two expert reports by Dr. Kevin Maki proffered by Gulf Island, and a declaration by [***] proffered by the government.  The expert reports by Dr. Taravella and Dr. Maki focus on NAVSEA's seakeeping criteria and Gulf Island's ability to comply and rest on a similar legal footing.  The [***] Declaration addresses the basis for NAVSEA's best value tradeoff decision and will be addressed separately.

### 1. *Taravella Reports*.

The First Taravella Report explains seakeeping and ship motions, opines on the Navy's seakeeping expertise, and analyzes Gulf Island's design against its seakeeping claims.  First Taravella Report at Suppl. AR00004-11.  Unsurprisingly, Dr. Taravella concludes that Gulf Island's design cannot meet the seakeeping requirements, specifically the pitch requirements.  First Taravella Report at Suppl. AR000011.  Dr. Taravella also suggests that the Navy "clearly knew or should have known through its expertise" that none of the T-ATS designs could meet the pitch requirements.  First Taravella Report at Suppl. AR000011.  Dr. Taravella's second report addresses critiques leveled by Gulf Island's expert, Dr. Maki, defends Dr. Taravella's initial methodology, and confirms his initial conclusions.  Second Taravella Report at Suppl. AR000108-31.  Dr. Taravella concludes that Gulf Island's proposal could meet pitch requirements, but only using limiting assumptions on displacement, pitch gyradius, and wave form instead of "account[ing] for a range of operating conditions [as expected by] industry standards."  Second Taravella Report at Suppl. AR000118.

Thoma-Sea justifies inclusion of the Taravella Reports on the basis of "the highly technical nature of the subject matter."  Pl.'s Am. Mot. at 14 n.2.  Thoma-Sea represents that "[w]hen necessary for meaningful judicial review, the court may supplement an administrative record with an expert report in order to improve or clarify the court's understanding of an important issue."  *Id.* (quoting *Plantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 241 (2016), and citing in support *Dyncorp, Int'l v. United States*, 125 Fed. Cl. 1, 3 (2016), and *Laboratory Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 386, 390 (2014)).

The government opposes supplementing the record with the Taravella Reports, contending that Dr. Taravella built his initial conclusions without reviewing key documents within the record, such as planning documents, indicative design studies, proposals from the other offerors, or decision documents from remand.  Def.'s Cross-Mot. at 27-28.[31]  Further, citing *AgustaWestland*, the government argues that Thoma-Sea's argument fails to "explain why the existing record is insufficient for effective judicial review, and why Dr. Taravella's report is

---

[31]Dr. Taravella's Second Report accounts for these documents.  *See* Second Taravella Report at Suppl. AR 000109-10.  The indicative design studies were not part of the administrative record at the time of Dr. Taravella's first report.

necessary for that purpose." *Id.* at 29-30 (citing *AgustaWestland*, 880 F.3d at 1331-32).  The government sees nothing in the technical details of the procurement to warrant Dr. Taravella's explanation, objecting that the report only serves to "second-guess the merits" of NAVSEA's decision.  *Id.* (citations omitted).

Gulf Island also opposes including the Taravella Reports, arguing that Thoma-Sea has failed to explain "how the [First] Taravella Report actually would aid the [c]ourt in resolving whether the Navy's evaluation was reasonable" or how the report fills gaps in the existing record.  Def.-Intervenor's Opp'n at 4-6.  Gulf Island also contends that the Taravella Reports rest on unexplained findings and incorrect assumptions.  *Id.* at 6.

The court may not supplement the record unless "the omission of extra-record evidence precludes effective judicial review," *i.e.*, when the existing record fails to permit meaningful review under the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of the APA.  *AgustaWestland*, 880 F.3d at 1331 (quoting *Axiom*, 564 F.3d at 1380-81) (subsequent citations omitted).  Seakeeping principles and the basis for NAVSEA's seakeeping criteria constitute topics of a specialized technical nature and require sufficient explanation and background as preparation for meaningful review.  In this instance, the existing record contains the necessary explanation and background.  From the record, the court can discern the basis for the seakeeping criteria NAVSEA established, along with the rationale for its ship design evaluation.  The record also discloses the means NAVSEA employed in its review of the seakeeping aspects of the offeror's proposals.  Dr. Taravella's reports do not shed new light on NAVSEA's analysis of seakeeping, or clarify pitch requirements of the solicitation, or explain seakeeping principles necessary to adjudge whether NAVSEA acted rationally.  The Taravella Reports do take issue with NAVSEA's assessment.  But contravening the government's assessment fails to satisfy the threshold for permitting supplementation.

Thoma-Sea's reliance on *DynCorp*, 125 Fed. Cl. 1, and *Palantir*, 129 Fed. Cl. 218, is not persuasive to allow supplementation in the context at hand in this case.  DynCorp sought to introduce an expert report and three declarations, all of which the court admitted.  *DynCorp*, 125 Fed. Cl. at 2-3.  The court found that two of the declarations filled gaps in the record that the government also sought to fill.  *Id.* at 3.  The third declaration was also relevant as it explained how DynCorp attempted to mitigate harm, and the court found the information necessary to understand whether the agency acted reasonably in proceeding with the procurement considering the harm caused to DynCorp by unauthorized disclosure of proprietary data.  *Id.* at 2-4.  The element of prejudice had not been effectively covered by the administrative record in *DynCorp*. *Id.*; *see also McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 712-14 & n.18 (2013) (explaining the difference between addressing evidence pertaining to equitable relief and for judgment on the administrative record).

The court in *Palantir* also allowed supplementation where some pertinent documents were available to the agency but had not been included in the administrative record.  An expert report also admitted in that case addressed contentions of bad faith, as well as information not likely to be submitted by the government as part of the record.  *Palantir*, 129 Fed. Cl. at 235-40.  The expert report also aided the court in understanding the agency's requirements and Palantir's capabilities, specifically whether Palantir offered commercially-available products that could

have met the agency's needs.  *Id.* at 240-42.  The Taravella Reports, by contrast, do not explain technical aspects of the solicitation necessary to ascertain whether NAVSEA exercised coherent and reasoned judgment, or shed light on procurement decisions made by NAVSEA, or address prejudice suffered by Thoma-Sea.

Accordingly, because Dr. Taravella's opinions are not essential to understand the relevant facts and materials already contained within the record, the court will not supplement the record with the Taravella Reports.

   *2.  Maki Reports.*

Gulf Island seeks to supplement the record with the Maki Reports if the court grants Thoma-Sea's motion to supplement the record with the Taravella Reports.  Def.-Intervenor's Opp'n at 6-7.  The Maki Reports take issue with analytical aspects of the Taravella Reports, argue that Gulf Island's design can meet its seakeeping claims, and defend Gulf Island's seakeeping analysis and assumptions.  *See, e.g.*, *id.* at 7.  Neither Thoma-Sea nor the government offered opposition to the Maki Reports.

The court will not include the Maki Reports in the administrative record for reasons akin to its decision respecting the Taravella Reports.  The basic description of seakeeping by Dr. Maki is redundant of materials in the existing record and not necessary for review of the competing seakeeping claims or NAVSEA's evaluation.  The remainder of the Maki Reports present information that defends NAVSEA's ultimate conclusions and counters the Taravella Reports.  Those aspects of the Maki Reports are inappropriate.  The court cannot make a decision about the reasonableness of NAVSEA's decision based on an analysis never presented to the agency.  Therefore, the administrative record will not be supplemented with Dr. Maki's opinions about seakeeping.

   *3.  [***] Declaration.*

The government, while opposing Thoma-Sea's attempt to supplement the record, proffers the declaration of [***] dated October 24, 2018, which elaborates on the basis for NAVSEA's ultimate decision in the procurement.  [***] Decl. at 1-3.  Mr. [***] chaired the Advisory Council during the initial decision, which elevated Gulf Island's ship design rating from "good" to "outstanding."  He then served as the Selection Authority on remand and re-confirmed the award.  [***] Decl. at 1.  Mr. [***] declares that even if Gulf Island's proposal failed to meet its seakeeping pitch claims, "it would have made no difference to [his] decision regarding Gulf Island's 'outstanding' rating for technical approach or [his] decision that Gulf Island's proposal offered the best value."  [***] Decl. at 2.  Mr. [***] explains that during remand, "the three strengths [of bollard pull, working deck area, and seakeeping compliance] did not have equal importance[, but that] by far the two most important strengths were the bollard pull and working deck area[, as these] were mandatory requirements" while "noncompliance with the seakeeping requirements may be mitigated through speed and course adjustments."  [***] Decl. at 2. Finally, Mr. [***] states that Gulf Island's proposal warranted an "outstanding" rating based on bollard pull and working deck area alone, but that he included seakeeping, a "far less important third strength," as "an additional supporting reason for [his] decision."  [***] Decl. at 2.

The government offers Mr. [***]'s declaration "solely to address the issue of prejudice," Def.'s Cross-Mot. at 39, arguing that the declaration "addresses . . . a scenario that no agency would ever address in the first instance," *i.e.*, would Thoma-Sea suffer prejudice if their claim about NAVSEA's seakeeping review had merit. Hr'g Tr. 108:25 to 109:9 (Nov. 27, 2018).[32] The government further argues that "the entire thrust of Mr. [***]'s declaration is rooted in . . . the administrative record." Hr'g Tr. 109:10 to 110:5. Thoma-Sea counters that the declaration represents a "post hoc rationalization in an effort to deflect attention from the Navy's procurement errors, and not remotely supported by the contemporaneous record." Pl.'s Reply at 1-2.

The court's review of the government's procurement decision must rest upon the administrative record as it existed at the time of the contested decision, *see, e.g.*, *AgustaWestland*, 880 F.3d at 1331, though "the parties [may] build a factual record respecting equitable relief that largely exists independent from the administrative record of the procurement," *McAfee*, 111 Fed. Cl. at 714 & n.18 (explaining that the court, not the agency, must find facts bearing on the appropriateness of granting equitable relief) (citing *Holloway & Co., PLLC v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009)). "[E]vidence pertaining to . . . injunctive relief [does not] supplement the [administrative record], but [becomes] part of this [c]ourt's record." *McAfee*, 111 Fed. Cl. at 714 n.18 (quoting *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 366-67 (2009) (some alterations in original)). Nonetheless, in considering the [***] Declaration, "this court is mindful that it must critically examine any *post hoc* rationalization." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 204 (2004) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 420; *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519 (1978); *Co-Steel Raritan, Inc. v. International Trade Comm'n*, 357 F.3d 1294, 1316 (Fed. Cir. 2004)), *aff'd*, 389 F.3d 1219 (2004).

The [***] Declaration describes the relative importance of Gulf Island's strengths as documented in the Advisory Council's initial evaluation of February 2018 and the Selection Authority's award confirmation on remand in August 2018. Mr. [***]'s central role in the evaluation process provides him with first-hand knowledge of NAVSEA's basis for the award to Gulf Island. Indeed, the government now adopts the premise of the [***] Declaration to explain the ultimate basis for the award. *See* Hr'g Tr. 56:1 to 57:16 (emphasizing the importance of bollard pull and working deck area, both of which were mandatory requirements). That emphasis is reflected in the administrative record, but not to the extent explicated in the [***] Declaration. In that respect, Mr. [***]'s belated explanation of award considerations represents a *post hoc* rationalization. Accordingly, the court admits the [***] Declaration, but as part of the court's record and to bear upon prejudice in the context of equitable relief. And, the court declines to give the [***] Declaration much weight because it manifestly constitutes a *post hoc* rationalization for the procurement decision.

---

[32]Subsequent references to the transcript of the hearing held on November 27, 2018, omit the date.

### B. *NAVSEA's Evaluation of Ship Design & SeaKeeping Claim*

NAVSEA's procurement evaluation must exhibit a "coherent and reasonable explanation of its exercise of discretion" and be free of "clear and prejudicial violation" of law or regulation. *Axiom*, 564 F.3d at 1381; *see also AgustaWestland*, 880 F.3d at 1332.

Thoma-Sea argues that NAVSEA acted arbitrarily and capriciously when it failed to verify Gulf Island's seakeeping claims and then used those "unsupported" claims to enhance Gulf Island's ship design rating. Pl.'s Am. Mot. at 11-13. Thoma-Sea points to the Selection Authority's award decision in February 2018, which reported that Gulf Island's design "actually exceeds" all seakeeping requirements and was the only proposal to do so. *Id.* at 17 (citing AR 56-15131). Thoma-Sea claims that NAVSEA merely relied on Gulf Island's representations instead of independently verifying their seakeeping data, *id.* at 12 (citing AR 77-19029 to 30), which was impermissible because NAVSEA "knew, or should have known, that no vessel falling within the [solicitation's] design parameters could meet all of the [s]eakeeping requirements," *id.* Thoma-Sea also argues that NAVSEA failed to carry out an affirmative obligation to "evaluate the . . . technical adequacy, sufficiency, and extent of the detail of the ship design." Pl.'s Reply at 8 (citing AR 10-339). Thoma-Sea further contends that the fact that only one proposal could meet the seakeeping requirement should have raised a "red flag" for NAVSEA. Pl.'s Am. Mot. at 17.[33]

The government and Gulf Island counter that NAVSEA had no reason to question Gulf Island's seakeeping representations because Gulf Island's pitch claims were close to those of the other offerors and close to those of the indicative design. *E.g.*, Def.'s Cross-Mot. at 32-33; Def.-Intervenor's Cross-Mot. at 18-21. The government and Gulf Island further argue that NAVSEA had no obligation to conduct an independent analysis because the solicitation did not specify that NAVSEA would do so. Def.'s Cross-Mot. at 34; Def.-Intervenor's Cross-Mot. at 11-18.[34] Lastly, the government and Gulf Island argue that strengths of Gulf Island's design apart from seakeeping warranted the "outstanding" ship design rating. As they would have it, seakeeping was but one of several factors leading to the upgrade and NAVSEA had other independent reasons for its ship design evaluation. *E.g.*, Def.'s Cross-Mot. at 37-38; Def.-Intervenor's Cross-Mot. at 25-26.

The record indicates that NAVSEA did not conduct a formal evaluation of the seakeeping claims of any of the proposals. Therefore, for NAVSEA to have formed a "coherent and reasonable" decision on Gulf Island's ship design rating, NAVSEA must either have reasonably

---

[33]Thoma-Sea also argues that based on its analysis of Gulf Island's design, Gulf Island presented flawed seakeeping analytical results. The court has denied Thoma-Sea's attempt to supplement the record with extra-record expert report offered in support for the contention. *See supra*, at 26-28.

[34]Gulf Island also offered a post-award analysis that its design conformed to the claimed seakeeping requirements. The court has denied Gulf Island's attempt to supplement the record with the extra-record expert report supporting this contention. *See supra*, at 28.

relied on Gulf Island's claims as a result of a comparative or indicative assessment, or have evidenced a basis for Gulf Island's ship design rating independent of seakeeping claims. Generally, a contracting officer may rely on certification by an offeror of technical compliance. *See Allied Tech. Grp. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011). But, that reliance must still be reasonable–facial evidence that the proposal could not or would not meet technical requirements would make that proposal technically unacceptable. *See id.* at 1330-31; *Hyperion*, 115 Fed. Cl. at 551. Correlatively, it would be unreasonable to rely on facially non-complying representations.[35]

The court finds inadequate support for the argument that the lack of an obligation stated in the solicitation to conduct a detailed seakeeping analysis permits, or even requires, the government not to conduct one. The solicitation nowhere limited NAVSEA's ability to verify any seakeeping claims. The solicitation states that NAVSEA "will assess how well the [proposal] demonstrates that it meets the seakeeping requirements." AR 19-1197. Accordingly, the assessment of seakeeping criteria had to be made by NAVSEA. The solicitation provided particular instructions to offerors in addressing seakeeping, calling for (1) seakeeping tables "populated with the roll, pitch, lateral acceleration, vertical acceleration, slamming, and wetness figures applicable to the [offeror's design]," AR 19-1180, (2) which table results "shall be verified by analysis," AR 10a-413, and prepared with use of "[t]he Bretschneider wave spectrum," AR 10a-361. Although offerors were "not required" to include their "detailed seakeeping analysis" in their proposals, the "information provided" would be used to evaluate the proposals against the seakeeping criteria. AR 88-19255 to 56.

---

[35]Neither *Allied Technology* nor *Hyperion* permit the government to rely solely on representations of compliance. Facial non-compliance exists not only when the proposal states it cannot or will not comply, but also when there is "significant countervailing evidence reasonably known to the agency evaluator [to] create doubt whether the offeror will or can comply." *Allied Tech. Grp.*, 649 F.3d at 1330-31 (quoting *In re Spectrum Sys., Inc.*, B–401130, 2009 WL 1325352, at *2 (G.A.O. May 13, 2009)); *Hyperion*, 115 Fed. Cl. at 555 ("significant likelihood" of non-compliance). Improbable or unexpected claims may give the agency reason to question representations, and failure act on such doubt would constitute arbitrariness, capriciousness, or an abuse of discretion. The government's attempt to distinguish this case from *Hyperion* unreasonably cabins facial non-compliance, constricting its meaning effectively to only affirmative representations of non-compliance. But *Hyperion* expressly rejects this limitation, as evident in its reasoning. In *Hyperion*, "all offerors agreed to comply" with subcontracting limitations in an Army contract, which the government argued constituted facial compliance, *Hyperion*, 115 Fed. Cl. at 551-52, but the court examined spreadsheets underlying cost summaries and discovered "an apparent mis-characterization of labor costs as a material cost" that would violate the subcontracting limits. *Id.* at 552. Because each proposal "demonstrated a strong *likelihood* that the [offeror] would be unable to comply with the limitation on subcontracting, it was irrational for the Army to find otherwise. *Id.* at 555 (emphasis added) (citing *Transatlantic Lines, LLC v. United States*, 68 Fed. Cl. 48, 53-54 (2005)). Given the offerors' likely and apparent errors, "[t]he Army should have inquired into their abilities to meet the [] requirement." *Id.* at 556-57.

Regarding NAVSEA's evaluation and basis for reliance, the administrative record discloses the following relevant facts.  In general, NAVSEA has extensive ship design expertise and experience with vessels similar to the proposed T-ATS.  Specific to the T-ATS procurement, NAVSEA developed and studied a T-ATS indicative design.  The indicative design studies showed that a somewhat modified commercial vessel similar to those proposed by the offerors came close to meeting all seakeeping criteria, even using a somewhat higher sea state and vessel speed than those used in the solicitation.  The indicative design studies concluded that other commercial vessels could probably achieve the criteria in the slightly lower sea state used in the solicitation.  The solicitation also reduced the transit speed from 12 to 11 knots.  Further indicating likely achievability, NAVSEA selected pitch requirements to match a NATO standard.  AR 96-19748 to 49.  And, Gulf Island's design was longer and slightly heavier than the vessel studied in the indicative design.  Given these circumstances, the court finds that Gulf Island's seakeeping claims do not "facially demonstrate a strong likelihood" of an erroneous representation.  NAVSEA could reasonably expect that Gulf Island's longer and slightly heavier vessel tested against the solicitation's more favorable parameters would perform better than the indicative design.  Thus, Thoma-Sea errs in seeking refuge in *Hyperion*, and NAVSEA did not err by relying on Gulf Island's seakeeping claims.  NAVSEA could effectively and reasonably evaluate ship design by comparing seakeeping representations to seakeeping requirements to determine compliance and the extent of risk created by non-compliance.

Thoma-Sea argues that the failure of the other offerors' designs to meet pitch requirements should have raised a "red flag" about the dubiousness of Gulf Island's claims.  Pl.'s Am. Mot. at 21.  But, the small differences involved do not "facially demonstrate a strong likelihood" of non-compliance.  Def.'s Cross-Mot. at 32-33; Def.-Intervenor's Cross-Mot. at 20.  Gulf Island met seakeeping requirements by a small margin, two of the other proffered designs failed in only a few instances (and by a small margin), and an additional design also met the pitch requirements.  Def.'s Cross-Mot. at 32-33; Def.-Intervenor's Cross-Mot. at 20.[36]  This is not "significant countervailing evidence" of non-compliance.  *See Allied Tech. Grp.*, 649 F.3d at 1330-31.  Further, the government's indicative design studies saw compliance as achievable, and Gulf Island proposed a ship of greater length than did the two others who failed the pitch requirement.  Nothing about Gulf Island's claims regarding the seakeeping results for its design warranted exhaustive reanalysis by NAVSEA.  Moreover, the record shows that when NAVSEA had doubts about an offeror's results, NAVSEA sought clarification.  Indeed, NAVSEA did so regarding Thoma-Sea's seakeeping table results for acceleration and deck wetness, *see* AR 52-13981, which issues were resolved after Thoma-Sea revised its seakeeping table, AR 52-13981; *see also* Hr'g Tr. 63:4-14, 81:10 to 82:2.

Turning next to the importance of seakeeping in NAVSEA's decision to upgrade Gulf Island's ship design rating, the record supports NAVSEA's overall assessment of the pertinent consideration.  The Advisory Council opined that Gulf Island's seakeeping "to be of significant value," AR 55-15115, and two different Selection Authorities called specific attention to how Gulf Island's proposal was the only one to meet all requirements, AR 56-15131; AR 87-19171.

---

[36]The administrative record has a chart that provides a seakeeping comparison of NAVSEA's evaluation of the proposals of each offeror and NAVSEA's indicative design.  *See* AR 51-13806.

The record also shows that Thoma-Sea exaggerates the significance of the non-mandatory seakeeping requirement on the rating for Gulf Island's design. Neither the Advisory Council nor Selection Authority identify or implicate seakeeping as the determinative factor in Gulf Island's ship design rating. Rather, other considerations, such as bollard pull and aft deck size, had a stronger bearing on the decision.

Comparative evaluation of strengths and weaknesses are issues of judgement for which the court may not substitute its judgment for the reasoned judgment of the procuring agency. *See COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1384 (Fed. Cir. 2012) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)) ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."). The Advisory Council was well within its discretion to evaluate the strengths and weaknesses outlined in the Evaluation Board's report and reach a different conclusion. *See* FAR § 15.303(b). The Advisory Council provided a "coherent and reasonable" explanation for increasing Gulf Island's ship design rating. Gulf Island's proposal, more so than the other proposals, "significantly" exceeded two key mandatory requirements: bollard pull and working deck area. AR 55-15115 to 16.

The Advisory Council also deemed Gulf Island's design to present a lower risk than that of Thoma-Sea, noting that Gulf Island used engines of "mature design with a proven history" whereas Thoma-Sea proposed to use an engine not previously integrated into its parent design. AR 55-15116, 15122. "Overall, the multiple strengths and margins [of Gulf Island's proposal], combined with providing all the desired capabilities and excellent seakeeping characteristics . . . , substantially more than offset the weaknesses and the risks." AR 55-15116. This conclusion could reasonably conform, even absent the reference to seakeeping ability, to the "outstanding" rating based on an "exceptional approach and understanding of the requirements[,] multiple strengths, and [low] risk of unsuccessful performance." AR 19-1195.

The Selection Authority was similarly well within his authority, *see* FAR § 15.308 ("[T]he source selection decision shall represent the [Selection Authority's] independent judgment"), to concur with the Advisory Council regarding ship design ratings, and his report provided a "coherent and reasonable" explanation for doing so. The Selection Authority noted that Gulf Island's "proposed design provides significant increased capability with respect to mandatory requirements [bollard pull and working deck area], which when combined with providing or exceeding all four of the desired capabilities, significantly increase core mission capabilities." AR 56-15131. Overall, NAVSEA articulated a reasonable basis for Gulf Island's "outstanding" ship design rating.

In sum, NAVSEA did not act unreasonably insofar as Gulf Island's seakeeping results are concerned, having considered the similarity of Gulf Island's claims to those of the indicative design and of other bidders and the non-mandatory nature of the seakeeping requirement. NAVSEA also articulated, contemporaneous with award, a sufficient basis to justify Gulf Island's "outstanding" ship design rating.

C.  *Gulf Island's Responsibility & NAVSEA's Responsibility Evaluation*

Thoma-Sea challenges Gulf Island's business ethics and integrity, citing contract disputes with Tidewater and Hornbeck Offshore.  In its offer, Gulf Island had cited one Hornbeck project as evidence of good past performance, but it did not disclose the existence of a contract dispute with Hornbeck regarding a subsequent contract.  That dispute apparently arose after it submitted its proposal but before award.  Pl.'s Am. Mot. at 23-24.  Gulf Island also did not disclose the dispute with Tidewater.  *Id*. at 26.  Thoma-Sea argues that Gulf Island's failure to disclose showed a lack of ethics and integrity, which should have prevented the Contracting Officer from finding Gulf Island responsible.  *Id*. at 22-24.  Further, Thoma-Sea contends that once NAVSEA learned of the Hornbeck contract, NAVSEA failed to inquire appropriately into the termination, improperly limiting its investigation on remand to discussions with Gulf Island.  *Id*. at 27-28; Pl.'s Reply at 14 & n.6.

NAVSEA did consider the Hornbeck and Tidewater disputes on remand.  The agency gathered information about the nature of the ongoing disputes from Gulf Island, and the Contracting Officer thereafter determined that Gulf Island remained responsible.  Def.'s Cross-Mot. at 45.  The government notes that Thoma-Sea fails to allege falsities in the assurances provided by Gulf Island, that Contracting Officers have broad discretion in responsibility determinations, and contends that the Contracting Officer had sufficient information in hand to satisfy the responsibility standards set out in FAR § 9.104.  *Id*. at 45-46.

Gulf Island also resists Thoma-Sea's responsibility claim, arguing that neither the solicitation nor other legal authority requires the disclosures sought by Thoma-Sea.  Def.-Intervenor's Cross-Mot. at 36-37.  Specifically, Gulf Island asserts that no legal authority required the Contracting Officer to obtain third-party information to reevaluate Gulf Island's responsibility.  *Id*. at 38.  Gulf Island further contends that Thoma-Sea cannot now raise errors regarding NAVSEA's evaluation of the Tidewater dispute, having failed to raise them its original motion for judgment on the administrative record.  Def.-Intervenor's Reply at 14 n.4.  This latter argument is unpersuasive because Thoma-Sea's amended motion does allege that NAVSEA erred in seeking information from Tidewater.  Pl.'s Am. Mot. at 27-28.

Regarding the offerors' disclosure obligations, the solicitation requires offerors to provide "a description of past performance experience in design and/or construction," but limits support to five contracts for offerors and five for offerors' major subcontractors.  AR 19-1185. The solicitation requires offerors to provide certain derogatory information for a "contract cited," AR 19-1185 to 86, but omits a general mandate to disclose negative contract performance, *see* AR 19-1185 to 86.  The solicitation also incorporated the disclosure requirements of FAR §§ 52.209-7 and 52.212-3.  AR 19-1149, 1150.  FAR § 52.209-7 requires disclosure of certain derogatory contract information, such as findings of or settlements acknowledging civil liability and fault, but only for federal government contracts.  FAR § 52.209-7.  Neither the Hornbeck nor the Tidewater disputes implicate public contracts.  FAR § 52.212-3 requires offerors to disclose a litany of business information and certify compliance with a list of laws and regulations.  FAR § 52.212-3.  For example, a contractor must certify whether it has been debarred or proposed for debarment, found criminally or civilly liable for specified offenses involving public contracts, or delinquent on taxes, FAR § 52.212-3(h), but nothing on the list implicates a finding of liability in

private contract disputes or the existence of an ongoing private contract dispute, *see* FAR §
52.212-3.  In short, the solicitation fails to require, either expressly or by reference to a FAR
provision, offerors to disclose adverse information regarding an ongoing private contract dispute.

Gulf Island may have had an implied obligation of disclosure, imposed by general
principles of integrity and business ethics.  *See* FAR § 9.104-1(d).  Because the FAR provides
little guidance on those principles, the Federal Circuit has suggested looking to "the . . .
extensive debarment regulations for guidance."  *Impresa Construzioni*, 238 F.3d at 1335.  Causes
for debarment include (a) conviction or civil judgment for offenses involving public contracts or
embezzlement, theft, bribery, criminal tax laws, or (b) willful failure to perform, a history of
failure or unsatisfactory performance, committing unfair trade practices, delinquent taxes, or
knowing failure by a principal within three years of the close of a government contract violation
of procurement laws or significant overpayment, or (c) "any other cause of so serious or
compelling a nature."  FAR § 9.406-2.

The Hornbeck dispute is a private contract dispute that remains active and contested in
Louisiana state court.  The later Hornbeck contract involved the construction of two vessels, and
was assumed by Gulf Island upon the purchase of Leevac Shipbuilding.  AR 83-19104; *see also
supra*, at 16 n.23.  On December 27, 2017, Gulf Island received a notice of default from
Hornbeck, citing electrical engineering and electrical installation claims.  AR 83-19104.  Efforts
to resolve the dispute failed and Hornbeck issued a notice of termination on March 19, 2018.
AR 83-19104.  Gulf Island's surety, Zurich North America, investigated the claim, and on
August 17, 2018, denied the claim based on their findings.  AR 83-19104.  Litigation in
Louisiana State Courts ensued and is unresolved.  *See Gulf Island Shipyard, LLC v. Hornbeck
Offshore Servs., LLC*, 2018-14866 (La. Div. A, 22d Jud. Dist. Oct. 2, 2018).

The contract with Tidewater also involves construction of two vessels.  On May 17,
2017, Tidewater filed for bankruptcy and did not take delivery of the first vessel.  AR 83-19104.
In July 2017, Tidewater's reorganization plan was approved by the bankruptcy court, and in
October 2017, Tidewater and Gulf Island agreed on completion of the two vessels, with a
contract amendment to that effect being executed on November 22, 2017.  AR 83-19104.  The
vessels were subsequently delivered.  AR 83-19104.  Following completion of the original
contract, Tidewater entered into a new contract with Gulf Island for dry storage of eight 250 foot
vessels.  AR 83-19104.

Neither dispute has resulted in a civil judgment, let alone the type of judgments listed in
the debarment regulations.  Neither dispute indicates willful conduct or a history of performance
deficiencies.  The Tidewater matter has been satisfactorily resolved, and the Hornbeck matter is
still in litigation.  An ongoing disputed termination involving a private contract does not
constitute a "cause of so serious or compelling nature," that it would implicate the standards for
debarment specified in FAR § 9.406-2.  Thus, Gulf Island's Hornbeck dispute has no bearing on
its integrity or business ethics for government procurement purposes.

The court further finds no support for Thoma-Sea's proposition that an offeror need not
disclose negative performance, but once it offers positive performance, it must then disclose all
contracts for that customer that weigh against it, even including pending disputes.  The court

declines the invitation to fashion such a requirement from general government contract principles, especially when procurement regulations both carefully limit the scope of disclosures or the conduct that implicates integrity and business ethics while also giving the Contracting Officer the ability to inquiry into past performance, whether disclosed or not.

Regarding the Contracting Officer's responsibility determination, the Contracting Officer may only award contracts to responsible offerors, *see* FAR § 9.103, and must obtain sufficient information to make a responsibility determination, FAR § 9.105-1.  As with other procurement decisions, the court examines the Contracting Officer's responsibility determination under the arbitrary, capricious, or abuse of discretion standard, *see* 28 U.S.C. § 1491(b)(4), which requires courts to determine whether the decisions exhibit "a coherent and reasonable explanation." *AgustaWestland*, 880 F.3d at 1332 (quoting *Impresa Construzioni*, 238 F.3d at 1332-33).

For the Contracting Officer to find an offeror responsible, he or she must find that the offeror has adequate financial resources, adequate management, experience, productive capacity to perform, and a satisfactory record of performance, ethics, and integrity.  *See* FAR § 9.104-1. An offeror lacks a satisfactory record of performance when it "has been seriously deficient in contract performance," considering "the number of contracts involved and the extent of deficient performance" and whether the circumstances were beyond the offeror's control or whether the offeror has taken appropriate corrective measures.  FAR § 9.104-3(b).  Integrity and business ethics implicate the debarment regulations of § FAR 9.406.  *Impresa Construzioni*, 238 F.3d at 1335.

The Contracting Officer's original responsibility determination relied on a pre-award financial capability survey conducted by the Defense Contract Management Agency, two financial surveys conducted by Dun & Bradstreet, Gulf Island's posting of bonds or agreement to post further bonds, NAVSEA's pre-solicitation site visit, the Evaluation Board's assessment of Gulf Island's past performance, and a review of federal procurement databases.  AR 54-14049 to 50.  None of these sources contain derogatory information that would contravene the Contracting Officer's judgment that Gulf Island is responsible to perform the contract, and these sources provided a sufficient basis for the Contracting Officer's determination under the requirements of FAR § 9.104-1.

While the Contracting Officer has a duty to investigate an offeror's responsibility, the contracting officer has "wide discretion" regarding responsibility determinations, and "is the arbiter of what, and how much, information [s]he needs." *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999); *accord Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002) (citing *Impresa Construzioni*, 238 F.3d at 1334–35).  And, that discretion may not be overturned if exercised reasonably and in conformance with law and regulation.  *See, e.g., PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010); *Axiom*, 564 F.3d at 1381-82 (citing *Impresa Construzioni*, 238 F.3d at 1334).  The Contracting Officer's inquiries on remand examined Thoma-Sea's post-award responsibility allegations and found them to be insufficient to reverse the prior responsibility determination respecting Gulf Island.  The court concurs.  In sum, the Contracting Officer evinced a reasonable explanation based on a variety of appropriate sources for the responsibility determination.

## D. **NAVSEA's Evaluation of Past Performance**

Thoma-Sea also contends that NAVSEA unfairly, unequally, and irrationally applied magnitude to past performance evaluations during remand.  On remand, Thoma-Sea and Gulf Island both saw reductions in overall past performance relevancy that left unchanged their respective positions on that factor.  Pl.'s Am. Mot. at 30-38.  Thoma-Sea contends that NAVSEA engaged in discussions with Gulf Island during remand, but with no one else, violating FAR § 15.306 and basic fairness.  *Id*. at 33; Pl.'s Reply at 15-17.  It further argues that when NAVSEA evaluated past contracts for relevancy, the magnitude of past contracts, measured by the dollar value, went from being ignored in the original evaluation to being the sole criterion on remand, both of which evaluative approaches conflict with the solicitation.  Pl.'s Am. Mot. at 29, 33-37; Pl.'s Reply at 11.  In the initial evaluation, Gulf Island received a "very relevant" rating, but the largest contract it submitted totaled $41.6 million, well below the $64.5 million per vessel limit or the approximately $520 million total contract value.  Pl.'s Am. Mot. at 29-32.  During remand, NAVSEA's focus on magnitude resulted in NAVSEA upgrading two contracts for Gulf Island, which Thoma-Sea argues involved a "'very different' hull form from the T-ATS."  *Id*. at 33-34, 36.  Thoma-Sea received no upgrades and three downgrades, *id*. at 34-35, leading Thoma-Sea to allege "intentional[] manipulat[ion]," of the past performance criteria, *id*. at 36; Pl.'s Reply at 13.  Thoma-Sea also asserts that NAVSEA erred by rating Hornbeck Conversion contract performed by Gulf Island first as "relevant," and then as "somewhat relevant" on remand, despite involving neither design nor construction work.  Pl.'s Am. Mot. at 29-30, 38; Pl.'s Reply at 17-18.  In a related vein, Thoma-Sea alleges NAVSEA erred by ignoring during remand the "highly-relevant" Hornbeck termination despite knowledge of the dispute.  Pl.'s Am. Mot. at 37; Pl.'s Reply at 14.

The government responds that NAVSEA's inquiries of Gulf Island on remand regarding the Hornbeck and Tidewater disputes cannot constitute discussions because the purpose was to evaluate Gulf Island's responsibility in light of Thoma-Sea's claims, Def.'s Cross-Mot. at 43-46, and NAVSEA never afforded Gulf Island the opportunity to revise its offer, Def.'s Reply at 15.  And, it contends that once NAVSEA received information regarding responsibility, NAVSEA could consider whether it bore on past performance.  *Id*. at 14-15.  Accordingly, NAVSEA had no reason to discuss past performance with Thoma-Sea because it did not obtain new adverse information regarding Thoma-Sea, nor engage in discussions with Gulf Island.  Def.'s Cross-Mot. at 44.

Regarding magnitude, the government asserts that on remand NAVSEA properly evaluated the magnitude of contracts proffered by the offerors for past performance.  Def.'s Cross-Mot. at 41-44.  Contacts of similar value per ship received similar ratings.  *Id*. at 41.  NAVSEA rated none of Gulf Island's contracts as "very relevant" on remand, which was consistent with Thoma-Sea's contention that none of Gulf Island's contracts equaled the magnitude of the T-ATS acquisition.  *Id*. at 41-42.  Looking to magnitude insofar as past performance was concerned on remand meant that ratings could change, causing, for example, a "relevant" contract to offset a "somewhat relevant" scope and complexity, which occurred for two Gulf Island contracts.  *Id*.  Regarding the Hornbeck conversion, the government argues that the hull and structural work provided a rational basis for NAVSEA to consider the project at least "somewhat relevant."  *Id*. at 43.  The government stresses that NAVSEA assigned Thoma-

Sea a higher past performance rating than Gulf Island, both originally and on remand.  *Id*. at 44.
Lastly, the government contends that NAVSEA did consider during remand whether the
Hornbeck dispute affected past performance, but found insufficient information to adjust Gulf
Island's risk rating.  *Id*. at 42-43.

Gulf Island emphasizes that NAVSEA's reconsideration of past performance on remand
responded to Thoma-Sea's earlier challenges at both GAO and initially in this court before
remand.  Def.-Intervenor's Cross-Mot. at 10-11.  Gulf Island explains that NAVSEA's focus on
magnitude, as sought by Thoma-Sea, predictably resulted in changed ratings.  *Id*. at 27-30.  As
expected, contracts valued below the per-ship value were deemed less relevant, whereas
contracts closer to the per-ship value received more relevant ratings.  *Id*.  And, Gulf Island
asserts that even assuming past performance errors, Thoma-Sea suffered no prejudice.  *Id*. at 34-
35.  Thoma-Sea and Gulf Island maintained their original "substantial confidence" and
"satisfactory confidence" past performance ratings, respectively.  *Id*. at 34-35.  Thus, Gulf Island
contends that no NAVSEA past performance decision during remand prejudiced Thoma-Sea.  *Id*.
at 35.

The court's review of NAVSEA's past performance decisions relates only on NAVSEA's
actions during remand.  NAVSEA's decision to use magnitude as a measure of past performance
relevancy in effect acknowledges that magnitude was given too little weight in the original
evaluation.  "The initial agency decision typically will not present a live controversy after
corrective action . . . [except] to the extent errors in the original evaluation have gone
unresolved."  *National Air Cargo Grp., Inc. v. United States*, 127 Fed. Cl. 707, 717 (2016)
(citations omitted).  Since the original alleged error by Thoma-Sea was that magnitude was
improperly ignored, NAVSEA's consideration of magnitude eliminates that issue, confining
review to whether NAVSEA's revised evaluation rests on a rational basis.  Further, as Gulf
Island notes, Def.-Intervenor's Mot. at 10, Thoma-Sea had agreed that its pre-remand claims in
this court on past performance were no longer at issue, *see* Pl.'s Unopposed Mot. for Leave to
File Am. Mot. for Judgment on the Admin. Record ("Pl.'s Mot. for Leave") at 2, ECF No. 44.

An agency engages in "discussions" when in a negotiated acquisition after establishment
of the competitive range, the agency communicates with the offeror "with the intent of allowing
the offeror to revise its proposal."  FAR § 15.306(d).  The agency must at least discuss with each
offeror under consideration "deficiencies, significant weaknesses, and adverse past performance
information to which the offeror has not yet had an opportunity to respond."  FAR §
15.306(d)(3).  If the agency conducts discussions, it must do so with all offerors in the
competitive range.  FAR § 15.306(d)(1), (3).  Thoma-Sea correctly asserts that NAVSEA may
not engage in conduct, specifically "discussions," that favors one offeror over another.  FAR §
15.306(e).  But no "discussions" occurred when the Contracting Officer's investigated Gulf
Island's responsibility by seeking information from Gulf Island concerning past performance
issues raised by Thoma-Sea.  *See DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 546-47
(2007).  The Contracting Officer did not speak with Gulf Island "with the intent of allowing
[Gulf Island] to revise its proposal," nor did revisions occur.  FAR § 15.306(d).

The queries by NAVSEA to Gulf Island were also not unfair, among other things because
they specifically related to responsibility claims raised by Thoma-Sea and not other matters.
During remand, the Contracting Officer had received no new adverse information about Thoma-

Sea and therefore had neither the obligation, nor a reason, to discuss past performance with Thoma-Sea.

As with other procurement decisions, the court examines NAVSEA's evaluation of past performance during remand under the arbitrary, capricious, abuse of discretion standard, *see* 28 U.S.C. § 1491(b)(4), examining whether the agency's decisions exhibit "a coherent and reasonable explanation." *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333). Evaluation of past performance implicates agency judgment to which the court owes a measure of deference. *E.g.*, *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 563-65 (2012) ("[A]ssignment of a past performance rating is reviewed 'only to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, [because] determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.'") (citations omitted), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013); *cf. COMINT Sys. Corp.*, 700 F.3d at 1384 (quoting *E.W. Bliss Co.*, 77 F.3d at 449) ("[T]echnical ratings . . . involve discretionary determinations . . . that a court will not second guess.").

The solicitation required NAVSEA to evaluate past performance "on both relevancy and performance confidence." AR 19-1195. Relevancy invokes the scope, magnitude, and complexity of past contracts. AR 19-1195. Confidence evaluates the agency's "expectation that the offeror will successfully perform" based on its performance record. AR 19-1195. Contrary to Thoma-Sea's contentions, the court finds no unfairness or irrationality in NAVSEA's focus on magnitude. Of the 14 re-evaluated contracts, four remained at their original relevancy ratings, eight were downgraded, and two were upgraded. *See* AR 86-19155 to 56, 19161 to 63. There is nothing irrational about relevancy changing in light of modified criteria. NAVSEA applied those criteria in an even-handed way.

The new past performance ratings also do not support Thoma-Sea's contention that NAVSEA's use of magnitude involved "unstated evaluation criteria," rating projects on "magnitude alone." Pl.'s Reply at 10-13. Along with magnitude, the Evaluation Board discussed considerations such as the type of work, hull form, and vessel in arriving at the relevancy ratings. *See* AR 86-19155 to 56, 19161 to 63. Notably, 13 of the 14 contracts identified by Gulf Island and Thoma-Sea for past performance purposes fit neatly into three strata: contracts valued at more than $51 million per ship were "very relevant," contracts between $15 million and $46.2 million were "relevant," and contracts below $15 million were "somewhat relevant." *See* AR 85-19132 to 37, 19141 to 44. It is reasonable to expect that projects of similar costs would involve similar complexity and scope of work. But, contrary to Thoma-Sea's claim that magnitude alone was determinative, one contract for bidder three valued at $30 million still received a "very relevant" rating because of "significant design and construction efforts" on a "Anchor Handling Tug Support" vessel, a vessel of "essentially the same size and complexity as the T-ATS." AR 85-19125 to 26.

The court further agrees with Gulf Island that Thoma-Sea suffered no prejudice from the NAVSEA's employment of magnitude. The relevancy rating fed into the confidence determination that represented the agency's "expectation" of successful performance "[b]ased on the offeror's recent/relevant performance record." AR 19-1195. For Thoma-Sea, despite the downgrade to relevancy, it still attained the highest "substantial confidence" rating.

Finally, NAVSEA's past performance re-evaluation considered information gathered from the Contracting Officer's August 2018 meeting with Gulf Island and Gulf Island's Second Quarter 2018 10-Q report. AR 85-19137. Regarding the Tidewater dispute, the Evaluation Board noted that the limited information provided by these two sources was "insufficient . . . to arrive at a factual determination as to the quality of [Gulf Island's] performance on the Tidewater contract" or to opine on "future performance risk," but noted it represented another "example of construction and delivery . . . [and] constitutes relevant past performance." AR 85-19137. The outcome of the Tidewater dispute, as confirmed Gulf Island's 10-Q, was not adverse to Gulf Island. Regarding the Hornbeck dispute, the Evaluation Board found "insufficient information" to adjust Gulf Island's performance risk, noting that when Hornbeck completed a Past Performance Questionnaire, it had not raised concerns with Gulf Island's performance on earlier contracts. AR 85-19137 to 38.

In short, contrary to Thoma-Sea's contention, NAVSEA did not "willfully ignore[]," Pl.'s Am. Mot. at 37, the Hornbeck dispute or address it in a "passing reference," Pl.'s Reply at 14, especially given the presumption of regularity afforded to NAVSEA, *see Galen Med. Assoc. v. United States*, 369 F.3d 1324, 1335 (Fed. Cir. 2004); *Glenn Def. Marine*, 105 Fed. Cl. at 568-69. And, there is no inconsistency in NAVSEA's treatment of the Hornbeck dispute for the responsibility determination and for the past performance evaluation. In both cases, NAVSEA found the information insufficient to adversely affect Gulf Island.

In sum, the court finds that it was proper under the solicitation to consider the per-vessel cost of shipbuilding contracts submitted by Gulf Island and Thoma-Sea for past performance purposes and that NAVSEA reasonably reevaluated the contracts.

### E.  NAVSEA's Best Value / Tradeoff Determination

In reviewing NAVSEA's tradeoff rationale and the resultant best value determination, the court "examine[s] the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations." *Galen Med. Assoc.*, 369 F.3d at 1330; *see also E.W. Bliss Co.*, 77 F.3d at 449; *Glenn Def. Marine*, 105 Fed. Cl. at 578. "Procurement officials have substantial discretion to determine which proposal[s] represent[] the best value for the government." *Glenn Def. Marine*, 720 F.3d at 908 (quoting *E.W. Bliss Co.*, 77 F.3d at 449). NAVSEA neither acted arbitrarily or capriciously, nor abused its discretion, when it conducted the ship design, past performance, and responsibility assessments. The court, therefore, will not disturb the ratings assigned for any evaluation factors, and will thus review NAVSEA's best value determination for a coherent and reasonable explanation that conforms to the solicitation and regulations.

The solicitation permitted NAVSEA to make an award to the "proposal [that] represents the best value, . . . price and other factors considered," using a "tradeoff source selection approach" that would compare proposals "on the basis of their ratings, and their strengths, weaknesses, risks, and price." AR 19-1194. "Accordingly, award [could] be made to other than the lowest priced Offeror." AR 19-1194. The solicitation's evaluation scheme specified that NAVSEA would give priority to ship design, followed by past performance, and then production and management equally, and would consider the four non-price factors "when combined" as "significantly more important than price." AR 19-1200; *see also* FAR §§ 15.303-05 (permitting

41

this approach if specified in the solicitation).  The FAR requires "the source selection decision [to] represent the [Selection Authority's] independent judgment" based on a "comparative assessment of proposals against all source selection criteria in the solicitation."  FAR § 15.308.

The Selection Authority's initial decision and that on remand discuss the recommendations of the Evaluation Board and Advisory Council, solicitation factors and the relative weight of each, and summarize considerations in the tradeoff process.  AR 87-19168 to 70.  Among the three offerors eligible for award (Gulf Island, Thoma-Sea, and bidder three), Gulf Island received a higher rating for ship design than the other two, comparable ratings for the production and management factors, and a lower rating for past performance.  AR 87-19169 to 71; *see also* AR 86-19149 (summarizing the evaluation of each proposal by factor).  Gulf Island's price was 1% above the lowest price, but more than 10% below bidder three.  AR 87-19171; *see also* AR 86-19149.  The Advisory Council found better value in Gulf Island's superior ship design because "significant margins for mandatory requirements and seakeeping characteristics . . . are considered to provide significant additional value to the Government," despite better past performance and a 1% lower cost offered by Thoma-Sea.  AR 86-19163 to 65.  The Selection Authority concurred, agreeing that Gulf Island provided best value due to "significant increased capability with respect to mandatory requirements, which when combined with [desired capabilities]" and seakeeping performance, outweighs Thoma-Sea's "advantage in [p]ast [p]erformance" and 1% lower cost.  AR 87-19171.  The Selection Authority also discussed the Defense Contract Management Agency's assessment that while Gulf Island appeared financially capable to handle the contract, Thoma-Sea was not.  AR 87-19170.  Overall, the rationale for preferring Gulf Island comports with the solicitation's evaluation scheme and reflects a reasoned judgment considering the comparative strengths and weaknesses of the proposals and the assessments of the Evaluation Board and Advisory Council.  The resulting decision is reasonable.

Given all the evidence before NAVSEA and its stated rationale for award, the award decision does not appear to be arbitrary, capricious, an abuse of discretion, or contrary to law or regulation.  The explicit prioritization of ship design over the other factors permitted NAVSEA to choose Gulf Island's superior ship design over those offered by Thoma-Sea and the other qualifying offeror.

## CONCLUSION

For the foregoing reasons, Thoma-Sea's motion for judgment on the administrative record is DENIED and the government's and Gulf Island's cross-motions for judgment on the administrative record are GRANTED.  The clerk shall enter judgment accordingly.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge